**NORTHERN INDIANA PUBLIC SER-VICE COMPANY, Plaintiff, and Defendant on Counterclaim,**

**v.**

**COLORADO WESTMORELAND, INC., Defendant, and Plaintiff on Counterclaim.**

Civ. No. H 85–0542.

United States District Court,
N.D. Indiana,
Hammond Division.

Aug. 4, 1987.

See also 112 F.R.D. 423.

Joseph R. Lundy, Ronald S. Safer, Marc W. O'Brien, Schiff Hardin & Waite, Chicago, William H. Eichhorn, Peter L. Hatton, Joel R. Page, Jr., Eichhorn, Eichhorn & Link, Kenneth D. Reed, Abrahamson, Reed & Adley, Hammond, Ind., for plaintiff.

Matthew J. Broderick, John M. Coleman, Melvin A. Schwarz, Kate D. Balaban, Dechert Price & Rhoads, Philadelphia, Pa.,

Charles A. Myers, McHie, Myers & McHie, Hammond, Ind., for defendant.

## OPINION

EASTERBROOK, Circuit Judge.[*]

The Northern Indiana Public Service Company (NIPSCO) generates electric power in coal-fired stations. It serves much of northwest Indiana. Unfortunately, NIPSCO's forecasts of its needs for coal have not been accurate—in part because the demand for power in the region has declined rather than increased (about 40% of its sales are related to the steel industry). NIPSCO also did not anticipate the rapid movements in the price of coal, which varies with the price of oil. Coal is valued for its energy content, so as the price of obtaining BTUs from oil declined, the price of coal also declined. The price of high-sulfur Midwest coal, readily available in the spot market, declined most quickly. The transportation cost from mines in Illinois and Indiana also was low. NIPSCO, however, was committed to purchase large quantities of high-priced, low-sulfur western coal. The delivered price of this coal sometimes was more than twice the delivered price of midwestern spot coal.

Two contracts with Colorado Westmoreland, Inc. (CWI) signed in 1977 obliged NIPSCO to take a total of 1,050,000 tons of coal per year through 1993. Although CWI and NIPSCO renegotiated these contracts in 1980, reducing NIPSCO's minimum take (and increasing the price per ton), a large supply of CWI's coal accumulated in a stockpile at NIPSCO's Mitchell generating station. The Public Service Commission of Indiana (which I call the PSC, even though its name recently was changed to the Indiana Utility Regulatory Council) thought the accumulation wasteful and excluded $52 million from NIPSCO's rate base (the "used and useful" investment on which a regulated utility is allowed to earn a regulated rate of return).

NIPSCO also had a contract with Carbon County Coal Co. requiring it to take a substantial number of tons per year. Con-cluding that it did not need so much low-sulfur coal (at least not at Carbon County's delivered price), NIPSCO broke its contract. The result was a judgment for $181 million in favor of Carbon County Coal. See *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265 (7th Cir.1986).

Reeling from the $52 million exclusion—but before the $181 million judgment—NIPSCO decided to renegotiate its contracts with CWI. NIPSCO had been having trouble keeping its generating units at the Mitchell station in compliance with environmental regulations while using CWI's coal. Seizing on this, NIPSCO told CWI that it considered the contract defunct; at the same time, NIPSCO tested CWI's coal in Unit 15 at its Schahfer generating station, which was having environmental problems of its own burning coal from Medicine Bow Coal Co. CWI's coal worked at Unit 15. NIPSCO offered CWI a contract to supply all of the coal Unit 15 needed. Between 1979 (when Unit 15 was placed into service) and 1982 Unit 15 had required about 1 million tons per year. CWI wanted a fixed-take contract; NIPSCO, intent on averting another fiasco caused by excess stockpiles, insisted on a requirements contract.

In May 1982 NIPSCO and CWI started negotiating a new contract. They signed the document in April 1983. The important clauses of this new contract (the Contract) provide:

SECTION 4—QUANTITY OF COAL

A. Buyer agrees to purchase from Coal Company and Coal Company agrees to sell to Buyer all of the coal required by Buyer during the term of this Agreement to supply Unit No. 15 at Buyer's R.M. Schahfer Generating Station in Wheatfield, Indiana (Hereinafter called "Schahfer Unit 15"). Buyer represents that its estimated annual requirement of coal for Schahfer Unit 15 is approximately one million tons, as set forth in Exhibit I hereto.

* Of the Seventh Circuit, sitting by designation.

B. At least 90 days prior to the beginning of each contract year ... Buyer shall advise Coal Company in writing of the quantity of coal it estimates it will require at Schahfer Unit 15 during that contract year and for each month of that contract year. [If the amount exceeds 1.25 million tons], Coal Company shall have the right [to limit its sales to that amount]. Coal Company shall supply Buyer with its full requirements up to 1,250,000 tons per year and agrees to use its best efforts to supply Buyer with contract year requirements in excess thereof....

E. Coal Company agrees that it will not execute contracts to sell coal from the Mine to others which when added to the amount of tons which Coal Company is at that time obliged to deliver to Buyer, call for a rate or amount of production which exceeds the capacity of the Mine. Coal Company will treat all of its purchasers fairly and will not give preference to other purchasers over Buyer in times of short supply or production delays.

F. On or before the 25th of each month, Buyer shall order from Coal Company, in writing, the quantity of coal it will require to be delivered hereunder during the next succeeding month, specifying quantities to be delivered in substantially equal deliveries during such month. The amounts so ordered in each contract year shall be in substantially equal monthly amounts, and shall in the aggregate approximate the tonnage specified pursuant to paragraph B above.

G. Nothing contained in this Agreement shall be construed to require the purchase of a quantity of coal greater than is needed for the operation of Buyer's Schahfer Unit 15; nor shall anything in this Agreement be construed to prevent Buyer from operating any and all of its generating stations, and utilizing other sources of power supply in the most efficient, economical, and prudent manner for the production and supply of electrical energy, nor shall anything in this Agreement be construed to cause Buyer to exceed its reasonable reserve stockpile requirement. Buyer shall treat Coal Company no less fairly than any of its other producers of coal.

....

SECTION 25—LIMITATION OF WARRANTIES

Except as specifically provided above in this Agreement, neither the Coal Company nor Buyer makes any warranty, representation or condition of any kind, express or implied (including no warranty of merchantability or of fitness for a particular purpose).

....

EXHIBIT I

SCHAHFER UNIT 15

ESTIMATED ANNUAL REQUIREMENT (TONS)

| Year | Tons |
|------|------|
| 1982 | 1,062,000 |
| 1983 | 887,000 |
| 1984 | 1,059,000 |
| 1985 | 981,000 |
| 1986 | 1,029,000 |
| 1987 | 1,042,000 |
| 1988 | 1,102,000 |
| 1989 | 1,179,000 |
| 1990 | 1,052,000 |
| 1991 | 1,117,000 |
| 1992 | 1,000,000 |
| 1993 | 1,000,000 |

After the parties signed this contract, NIPSCO promptly tendered the annual estimate called for by § 4.B, in an amount similar to the estimate shown in Exhibit I. NIPSCO later reduced its purchases for 1983 because Unit 15 suffered an unexpected outage. All told, NIPSCO took 737,655 tons in 1983. NIPSCO delivered an estimate for 1984 of 1,011,300 tons. It ended up taking only 713,295. It estimated 650,000 tons for 1985 and took 573,305; it estimated 263,600 tons for 1986 and took 314,871. (CWI shut its mine for the last half of 1986 because of a fire, but NIPSCO's personnel testified that by then CWI already had delivered all the coal NIPSCO needed for the year, because a steel strike diminished the demand for NIPSCO's electricity. The parties agree that 1986 was an aberration.) And by mid–1984 NIPSCO's internal estimates were showing requirements at Schahfer Unit 15 in the vicinity of 300,000 tons per year for 1986–87, though

with a recovery to 600,000 tons and up for 1988 and later years.

NIPSCO and CWI are at odds about why Unit 15 is burning so much less coal than the contract estimated, about whether this change was predictable in 1983, and about whether NIPSCO is required to take from CWI the tons listed in Exhibit I whether or not Unit 15 burns them. CWI sent NIPSCO demand letters insisting on compensation for the shortfall. NIPSCO then filed this diversity suit, which the parties agree is governed by Indiana law. NIPSCO sought a declaratory judgment that it has abided by the Contract and that the Contract remains in force through its termination date in 1993. CWI filed a counterclaim for damages for breach, and added claims based on promissory estoppel.

A bench trial was held between July 6 and July 20, 1987. This opinion contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52. The parties have stipulated to a substantial agreed statement of facts; each side also has accepted many propositions in the other's proposed findings of fact. I adopt all of these agreed-on facts. To the extent the compression necessary to produce a readable opinion yields any inaccuracy, the agreement of the parties controls. But the parties do not agree at all on why Unit 15's burn has been cut, whether NIPSCO should have foreseen this (or did), and what the negotiators said to each other about the meaning of the terms in the Contract. I concentrate on resolving these contested matters. Part I addresses the nature of (and the reasons for) the change in the operation of Unit 15, Part II discusses the negotiation and meaning of the Contract, and Part III handles some residual matters. As CWI's post-trial brief accurately puts it, the central question in the case is whether the Contract "permit[s] NIPSCO to take advantage of the lower cost of electric production at its other units to produce more electricity there than at Unit 15 when that cost differential was known at the time NIPSCO represented its coal needs at Unit 15 to be about one million tons annually". I answer that question

"Yes", and accordingly judgment will be entered for NIPSCO.

CWI advances several legal theories. One is essentially fraud: that NIPSCO estimated requirements of one million tons annually while knowing that Unit 15 would not burn this much, and that fraud in the inducement entitles it to repudiate the Contract. The claim of fraud, that NIPSCO was keeping two sets of books, is the subject of Part I, which also covers the related claim that NIPSCO did not determine its requirements in good faith. CWI's second claim is that even if NIPSCO acted in good faith, its negotiators made representations that are the basis of an estoppel because NIPSCO intended CWI to rely on them, and CWI did. This is the subject of Part II.A. Finally, CWI contends that the Contract itself, independent of collateral promises, requires NIPSCO to take the amounts contained in Exhibit I. I cover this and related claims in Parts II.B and III of this opinion.

## I

### A

Any electric utility should produce power as cheaply as possible, subject to the constraint that lower costs not unduly reduce the reliability of the system. NIPSCO has consistently attempted to do this, using its own equipment to the maximum possible degree. This has led, ironically, to very high costs.

The demand for power on NIPSCO's system averages about 1,400 MW (megawatts), with the average daily minimum about 1,300 MW, the peak demand in the ordinary week approximately 1,600 MW, and the yearly peak around 2,400 MW. (The demands here do not include power generated and used internally by NIPSCO's customers; the steel mills in NIPSCO's territory operate more than 300 MW of their own generating equipment.) Modern coal-fired plants are most efficient at about 600–700 MW per unit, with two or more units in a station; 800 MW per station (two 400 MW units) is probably the smallest reasonably efficient size. See Paul L. Joskow & Richard Schmalensee,

*Markets for Power* 48–54 (1983). If NIPSCO operated only units of this size, however, it would have so few that a combination of ordinary maintenance and unexpected failure might leave it unable to cover the demand for power. The larger the units, the fewer NIPSCO will possess; the fewer units it possesses, the greater the vulnerability of the system to chance events.

NIPSCO in fact operates a substantial number of coal fired units, with "net demonstrated capacity" (highest sustainable output) between 60 and 472 MW apiece. It also operates some units fired by oil or gas and two small hydro units; the hydro units are too small to matter, and the gas turbines are used only to cover peak demands. I therefore ignore both kinds of units in this opinion. And NIPSCO has contracted for power from neighboring utilities. Until 1987 NIPSCO took a "firm" 400 MW of power from Indiana & Michigan Power Co. (a subsidiary of American Electric Power Co.). This was a commitment that I & M met from its whole system, so it was exceptionally reliable; it was also exceptionally inexpensive. (For 1987 NIPSCO is taking 200 MW of power from I & M; starting in 1988 it will take none.) NIPSCO operates four "stations"—Michigan City, Bailly, D.H. Mitchell, and R.M. Schahfer—each with multiple generating units. As of 1983, NIPSCO's system had these resources, the average cost of which is shown (PX 174):

| Unit | Maximum | Minimum | $/MWH |
| --- | --- | --- | --- |
| "I&M Contract" | 400 | 400 | |
| Michigan City 12 | 469 | 250 | 18.98 |
| Bailly 8 | 320 | 180 | 19.72 |
| Bailly 7 | 160 | ? | 19.88 |
| Michigan City 2/3 | 120 | 30 | 23.38 |
| Schahfer 17 | 344 | ? | 24.58 |
| Mitchell 4 | 125 | ? | 30.38 |
| Mitchell 6 | 125 | ? | 30.51 |
| Mitchell 5 | 125 | ? | 30.54 |
| Mitchell 11 | 110 | ? | 30.97 |
| Schahfer 15 | 472 | 200 | 34.25 |
| Schahfer 14 | 431 | 220 | 36.01 |

In 1986 NIPSCO put Schahfer 18 into service. This unit is a twin of Schahfer 17.

Two things principally cause the dramatically different costs per megawatt-hour. One is the "heat rate" of the unit—the number of BTUs needed to produce a kilowatt-hour of electricity. The lower the better. Larger and newer units have lower heat rates. The other is the delivered cost of fuel. Some of NIPSCO's units can use high-sulfur coal and others, because of environmental restrictions, must use the substantially more expensive low-sulfur coal. (It is both more expensive at the mine mouth and more costly to ship, because it must travel longer distances. For extended periods, the rail costs per ton of moving CWI's coal to Indiana have exceeded CWI's price per ton.)

Even among high-sulfur units burning midwestern coal there is a substantial difference in variable costs of operation. Bailly 8 and Schahfer 17 burn identical coal. But Schahfer 17, a brand new unit, has a flue gas desulfurization unit (a "scrubber"), which is costly to operate; Bailly 8 does not. (I refer only to the average variable costs of operation. None of the costs in the table includes the cost of building the station. Throughout this opinion I disregard sunk costs.) The EPA allows Michigan City 12 and the Bailly units to discharge unscrubbed stack gas because they are located in dirtier areas and are older. On how Congress and the EPA have come to induce utilities to burn high-sulfur coal, see Bruce A. Ackerman & William T. Hassler, *Clean Coal/Dirty Air* (1981).

Changes in the price of coal will affect the costs of production. For example, in 1986 Bailly 8 was the cheapest unit, at $17.35 per MWH, because the cost of spot coal had declined, while Michigan City 12, burning coal on a contract, cost $21.19 per MWH. But low-sulfur units have been substantially more expensive throughout than high-sulfur units; in 1986 Schahfer 15 cost $36.26 per MWH to run.

The marginal cost of production may be higher or lower than average variable costs. Each unit has a most efficient output, generally at 80–90% of net demonstrated capacity. Marginal costs of power fall as the unit produces more megawatts and rise after the optimal point. It is therefore advantageous to run any unit—if it is run at all—at its optimally efficient point, even

beyond it if the next MW of power from this unit is cheaper than the next MW of power from the next-most-efficient unit.

NIPSCO uses principles of "economic dispatch" to decide how much power to obtain from each unit in use (a "spinning" unit). Employees of NIPSCO run a control center, where computers show the demand on the system and the production of each unit. The computers (and the employees) know the marginal costs of each unit at different levels of output. As demand rises during the day, NIPSCO increases the output of the unit then on line that has the lowest marginal costs of producing the needed amount of power. (NIPSCO usually makes changes in 10 MW increments.) If necessary, NIPSCO starts up a new unit to cover demand. Because the load on the system and the amount of power generated must balance, NIPSCO also reduces the output of its units as demand falls. It cuts back on the most expensive power then being produced. All of these decisions are made at the margin, using costs that have been computed for each increment at each unit. NIPSCO used these principles of "economic dispatch" in 1982 and 1983, when NIPSCO and CWI were negotiating; CWI knew that this was how NIPSCO dispatched its spinning units.

It is not possible, however, to add and subtract power wholly by reference to marginal cost. Units take time to build up power. Unit 15, for example, takes two hours to go from 200 MW to 472 MW. PX 42, p. 6. An increase in demand therefore may have to be filled from the unit that can get up to power first, rather than from the unit that can produce sustained power at the least cost. Moreover, once a unit is turned off altogether (as opposed to being reduced to its minimum generating level), it may take two days to bring the unit back on line. How long it takes depends on how far the internal temperature of the unit has fallen and the size of the unit. Large units can change temperature only so fast; to turn on the boilers full blast before the turbines have warmed up may cause fractures or worse. It is therefore very difficult to move large units on and off line frequently. NIPSCO, like other utilities, tries to keep on line the units it needs, even if this entails running them at inefficiently low loads.

There is also a problem of reliability to consider. A unit on line may fail unexpectedly. A small shortfall may be reflected in a "brownout" (all customers receive power but at lower voltages, a form of rationing). When there is a larger shortfall, the utility must either supply the missing power quickly or "shed load"—that is, terminate service to some customers. Failure to shed load may lead to permanent damage to generation and transmission facilities. The customers whose loads have been "shed" do not appreciate this—especially if they are running blast furnaces or rolling mills that depend on reliable power.

Because it is impossible to fire up new plants quickly when a plant on line fails, utilities maintain "spinning reserves". Spinning reserves are the unused capacity of plants that are on line. These plants may be "spun up" to cover the loss from an unanticipated failure. One standard in the industry, to which NIPSCO tried to conform, is that the utility have enough spinning reserves to cover, within 10–30 minutes, the unexpected failure of the largest plant in the system. See Joskow & Schmalensee, *Markets for Power* 73. While spinning up its own reserves, the utility will buy "emergency power" from neighboring firms. NIPSCO is a member of the East Central Area Reliability Council (ECAR), a number of connected utilities that agree to supply power to one another in time of need. ECAR's members collectively can cover a shortfall much faster than any one member can. The ability of NIPSCO to buy power from its neighbors plays another role in the case, to which I return.

NIPSCO operated its system to obtain the most efficient output from the units then running, but in 1983 it did not decide which units to run so as to minimize costs. Suppose NIPSCO anticipated a load on a given day of 1,300 MW. The cheapest way to meet that load in 1983 would have been with 400 MW of power from I & M, 420 MW of power from Michigan City 12 (about

90% of its net demonstrated capacity), 288 MW from Bailly 8, 144 MW from Bailly 7, and 108 MW from Michigan City 2 and 3 (twin units with 60 MW maximum apiece). If NIPSCO anticipated a demand of 1,600 MW, it could put Schahfer 17 on line. If demand unexpectedly exceeded estimates, NIPSCO could turn on its gas-fired turbines, which come up to full power quickly; NIPSCO has 241 MW of capacity in these "peaking" units. It would not need the low-sulfur (and high-cost) units at Mitchell and Schahfer Stations unless the demand was anticipated to exceed 1,600 MW or one of the high-sulfur units were out of service.

If NIPSCO ran its system this way, however, it would be unprotected against failure. In order to be able to replace the 420 MW of power it would lose if Unit 12 were to fail, NIPSCO needed 420 MW of "spinning reserves". Only Schahfer Units 14 and 15 were large enough, in combination, to supply this. Schahfer 14, running at its minimum state of 220 MW, has 211 MW of spinning reserves (168 MW if NIPSCO plans to take it only to 90% of net demonstrated capacity); Schahfer 15, running at its minimum state of 200 MW, offers 272 MW of spinning reserves (225 MW if spun up to 90% of net demonstrated capacity). Schahfer 14 and 15 between them cover the requirements for spinning reserves, even when Michigan City 12 is running full blast. So NIPSCO ran them as of course when they were available. In NIPSCO's parlance, Schahfer 14 and 15—like Michigan City 12 and Bailly 8—were "run-when-available" units. Unless they were down for service or repairs, these four units ran every day.

Why only Michigan City 12, Bailly 8, and Schahfer 14 and 15? What happened to Bailly 7 and the other inexpensive, high-sulfur units? These units, and the cost savings they offered, were casualties of NIPSCO's quest for a reliable system. Once NIPSCO turned on Schahfer 14 and 15, it obtained 420 MW of power even at their minimum state. The generation and load of the system must balance. That meant turning off lower-cost units or reducing the output of ("backing down") these units. It had 400 MW of firm power from I & M, 420

MW of power from Schahfer 14 and 15 (power that could be sloughed only by turning off the units), 420 MW readily available from Michigan City 12, and 288 from Bailly 8. That is 1,528 MW, with plenty of spare power spinning at Schahfer. Because average loads on the NIPSCO system are less than 1,528 MW, NIPSCO had to back down Michigan City 12 and Bailly 8. In other words, to ensure reliable power for its customers, NIPSCO was running the two most expensive plants in the system full time, and to "make room" for the costly power from these two plants, it had to run its two most efficient plants at less than their optimally efficient levels (and not run other low-cost plants at all). And this was on a system inefficient to start with because of the small average size, and old age, of its plants. By one estimate, NIPSCO's marginal cost of power is approximately twice that of other utilities in the region.

### B

The steel industry in northern Indiana, hard pressed to meet foreign competition, wants cheap electricity, which is a substantial component of the cost of finished steel. When the PSC granted NIPSCO a 20% increase (on top of its high base) shortly after CWI and NIPSCO signed their contract in the spring of 1983, the steel industry and other large customers sought ways to cut NIPSCO's prices—or at least moderate future increases.

Every quarter the PSC adjusts NIPSCO's prices to take account of changes in the cost of fuel. The steel industry opposed NIPSCO's request for an increase in the fall of 1983, contending that NIPSCO operated its system inefficiently. The industry, joined by the PSC's own consumer advocacy arm (the Utility Consumers Counselor's Office), maintained that NIPSCO should not recover the higher costs of fuel, because it was neglecting a cheaper source of electricity—"economy power".

Economy power is electricity available from neighboring utilities on a minute-to-minute basis. All utilities maintain spinning reserves; all face fluctuations in de-

mand. This means that a utility may be able to produce and sell, over the nation's network of long-distance, high-voltage transmission wires, substantial quantities of electricity. NIPSCO was buying 400 MW of "firm" power from I & M 'round the clock, 365 days a year. I have already mentioned "emergency" power, which is costly but essential in times of need. Still another kind of power is economy power, which one firm will generate using otherwise-idle (but spinning) capacity for the benefit of its neighbor. A firm with a large plant able to make some marginal MW of power for, say, $15/MWH may sell it to a neighbor. If the buyer's costs of generating the same power are $25/MWH (25 mills/KWH: mills/KWH being the usual pricing unit), both firms gain at any price between the two. Splitting the savings appears to be customary in the industry. For much of NIPSCO's operating day, economy power is available at about 18–20 mills/KWH.

Economy power is not guaranteed. The selling firm may withdraw it on 10 minutes' notice. The buying firm therefore can purchase economy power only against spinning capacity. If the marginal megawatts of the highest-cost unit on line cost NIPSCO more to produce than economy power costs to purchase, NIPSCO (and its customers) can benefit if NIPSCO "backs down" its expensive plants and replaces the power with economy purchases. If the selling utility withdraws the power, NIPSCO can spin up its plants to cope.

Until early 1984 NIPSCO purchased economy power only to cover peaks. It covered its average load with its own equipment, even when its marginal cost of production was significantly greater than the cost of economy power. The PSC ordered NIPSCO to change its policy. An order entered on December 27, 1983 (the Economy Purchase Order or EPO) directed NIPSCO to buy more power, in order to reduce its costs of fuel. Although the PSC approved NIPSCO's request for an increase to cover the cost of fuel, it also directed NIPSCO to file a report "detailing its efforts toward developing systematic procedures designed to facilitate to the full-est extent reasonably possible the location, acquisition and utilization of excess electricity from neighboring utilities to be utilized in supplementing NIPSCO coal generation."

NIPSCO sought rehearing of this order, on the ground that it would impair the reliability of its system. As NIPSCO saw things, it could not buy economy power by backing down the output of Michigan City 12 or its other inexpensive high-sulfur coal plants; marginal power was available from these plants at or below the cost of economy power. To save money, NIPSCO had to cut the output of its high-sulfur plants. But as these generally ran at minimum capacity and were used to provide spinning reserves, NIPSCO could not cut them back further without taking them off line— which would impair its ability to meet emergencies. On February 22, 1984, the PSC denied rehearing, making these comments:

> In our original Order in this cause, this Commission did not envision NIPSCO shutting down a generating facility and replacing its output with purchased power from a neighboring utility. The start up time necessary to bring the shut down facility back "on line" is so great that it would detract from the reliability of NIPSCO's service. However, we did envision NIPSCO decreasing its generation output in its more expensive generation facilities, to the degree that with reasonable notice the output from those plants could be raised to the maximum level.

Order of Feb. 22 at 3. What the PSC described is physically possible but would not save much money, indeed might cost the consumers some money. The Order of February 22 envisions economy purchases against the output of Schahfer 14 and 15 and the Mitchell units. These were used, at more than minimum levels, only in peak periods. So perhaps the Commission was hinting only that economy power should be purchased in peak periods. But keeping the more expensive units on line just to be able to purchase economy power in peak periods might increase system costs, if it

led to more of the expensive generation capacity being on line in slack periods.

John Dunn, the vice president of NIPSCO in charge of generation, decided that the only way to comply with the Economy Purchase Order and ensure a substantial savings was to change the dispatch criteria of the system. Instead of running Schahfer 14 and 15 whenever they were available, Dunn decided to run the entire system according to cost considerations. That meant putting Michigan City 12, Bailly 7 and 8, and Schahfer 17 on line as the principal units, and covering additional needs with the smaller stations at Michigan City before turning on the big units Schahfer 14 and 15. The new dispatch criteria reduced NIPSCO's spinning reserves, which meant less reliability; it also reduced the percentage of NIPSCO's power being generated by the low-sulfur units. The combination meant substantial savings—although, as things turned out, NIPSCO purchased only a little more power from outside than it had in 1982 and 1983. (It is not necessary to go into detail, and the figures, PX 231 p. 20, show only net purchases without isolating their nature. NIPSCO purchases non-economy power and also sells power to other utilities, so that net purchase figures may mislead.)

Under the new approach, implemented in the spring of 1984, Schahfer 14 and 15 were run principally during high-load periods (weekdays and evenings) and when other units were off line for repairs. NIPSCO purchased economy power against the marginal output of Schahfer 14 and 15, when they were on line, and the Mitchell units when they were on line. NIPSCO declines to take more than 150 MW of economy power at a time (because it believes more than that would be too difficult to cover if withdrawn), and for reasons not fully explored in this case does not buy economy power unless it is available at 6 mills/KWH less than the cost of generation from NIPSCO's plants—which essentially means that NIPSCO will not reduce the output of its high-sulfur plants to buy economy power.

The PSC reviewed NIPSCO's performance in subsequent quarterly fuel-cost orders. In a sequence of orders through 1984 and 1985, the PSC praised NIPSCO's compliance with the Economy Purchase Order. The Utility Consumers Counselor's Office, which monitored NIPSCO's compliance (including a review of the hour-by-hour purchase and dispatch decisions), also was satisfied. As in many administrative cases, the "law" is found not so much in the formal orders as in the day-to-day implementation; the regulated firm tries to comply with the views of the regulator's staff. That process, much in evidence between NIPSCO and the PSC, led to the dispatch criteria NIPSCO has been using since spring 1984.

The PSC was entitled to think that the order had done some good, since economy power is cheap relative to power generated by NIPSCO. NIPSCO's change in dispatch criteria saved consumers even more money, relative to what economy purchases alone would have achieved. NIPSCO uses a computer model, discussed below, to project how its system will operate. Usually NIPSCO estimates the demand, cost, and operating factors it will encounter and uses the model to predict, for example, how much coal it needs to buy. The model also can perform retrospective "what-if?" calculations. The operators feed the model with the actual data the system encountered (that is, actual costs of fuel, actual consumption of electricity, actual down-time of plants, actual prices of economy power) and change some other things (such as which plants are put on line). The model then estimates what would have changed had the system been operated in the hypothesized way.

Frank Venhuizen, the head of computer modeling at NIPSCO, used the model to determine what would have happened after the EPO had NIPSCO started buying economy power (up to 150 MW, whenever it was 6 mills/KWH less than internal cost) and kept Schahfer 14 and 15 on run-when-available status. The model estimated that fuel costs at NIPSCO would have been $3.3 million higher in 1984, $8.4 million higher in 1985, and $19.5 million higher in 1986 than

they were. Tr. 2272–73. This is a system-wide increase of 0.35 mills/KWH in 1984, 0.97 mills/KWH in 1985, and 2.37 mills/KWH in 1986. This despite the fact that, with Schahfer 14 and 15 on line more, NIPSCO would have purchased as much as 30% more economy power than it actually did. Tr. 2324. With Units 14 and 15 on run-when-available status, and no economy purchases, NIPSCO's costs would have been even higher than those in Mr. Venhuizen's calculations.

So the EPO saved NIPSCO (and its consumers) a lot of money; Mr. Dunn's rearrangement of the dispatch criteria at NIPSCO in response to the EPO saved them even more; but the consequence was that NIPSCO used more high-sulfur coal and less low-sulfur coal. CWI and Carbon County Coal bore the brunt of this. Carbon County, which had a fixed-quantity contract, has recovered damages. CWI hopes to do as well.

### C

Exhibit I to the contract came from NIPSCO's computer model of the long-run operation of its system. Called PROMOD, the model is the work of Energy Management Associates, Inc., of Atlanta, and is used by more than half of the industry for the same purposes for which NIPSCO employed it. The value of a model's output depends on the data and assumptions fed in. Several witnesses testified, and I find, that NIPSCO used PROMOD in a reasonable way. NIPSCO made reasonable efforts to estimate future costs and demands, the important variables in the model. These estimates turned out to be wrong, but that is the nature of predictions. NIPSCO consistently overestimated the growth of demand for its electricity; as demand fell in absolute terms, NIPSCO simply reduced its estimate of the rate of growth. But NIPSCO's estimates were based on the best available data and a reasonable methodology. I essentially agree with the testimony of Eugene T. Meehan, an employee of EMA, and Kent P. Anderson, an economist, that NIPSCO made estimates and employed the PROMOD model in a commercially reasonable way. Not perfect, but

reasonable and in good faith. See PX 182 —PX 193, comparing NIPSCO's projections with other forecasters'. There is little reason to spell out the data and the conclusions, given the view I take below of the meaning of the Contract.

Mr. Venhuizen produced Exhibit I in July 1982, using the best estimates NIPSCO had about future demand and costs. He assumed that NIPSCO would reduce its purchases from I & M during 1986; this turned out to be wrong (they did not begin to decline until 1987), but the error is unimportant. The modeling also included the assumption that Schahfer 17 would "go commercial" (produce electricity for commercial sale) in mid–1983 and that Schahfer 18 would follow in mid–1985. The latter assumption also proved to be a year off; it offset the mistaken assumption about curtailing the take from I & M.

Three assumptions made in mid–1982 account for the large difference between PROMOD's predictions and what happened. First, Mr. Venhuizen assumed that Schahfer 15 would be run when available, at least at minimum capacity, but that production above minimum would depend on the marginal costs of the units then on line. This assumption, reflected in the PROMOD designation "M" for "must-run", treated Unit 15 as on line 'round-the-clock for about 325 days per year. (NIPSCO told PROMOD to assume some time for routine maintenance and other planned outages, and PROMOD would make probabilistic computations about the likelihood and duration of unplanned outages.) Unit 15 would burn more than 750,000 tons of coal per year when run round the clock at 200 MW. To the extent it was called on to supply more than 200 MW at peak hours, or the minimum state were more than 200 MW, it would burn more than this amount. (During most, if not all, of the time CWI and NIPSCO were negotiating this contract, NIPSCO treated Schahfer 15 as having a minimum capacity of 280 MW. I find that NIPSCO did not promise CWI that it would retain this minimum. Both minimum and maximum capacities of generating plants

change over time, with adjustments, repairs, and the breaking in of parts.)

In other words, Venhuizen told PROMOD to assume that Schahfer would be run in the future just as it *had* been run in 1980–82, years when it burned about one million tons per year. The output of the PROMOD run that became Exhibit I was almost entirely dependent on this constraint and assumptions about how long the unit would be out of service for maintenance and unplanned repairs each year. The low estimate for 1983, for example, came from the assumption that Unit 15 would be taken off line for an extended period to make alterations to improve its heat rate. If Unit 15 had remained as a run-when-available (PROMOD M or must-run) unit, it would have burned close to the Exhibit I estimates.

Two other assumptions were potentially important to the results. One was the rate of growth of demand for NIPSCO's electricity, the other was the price of coal. Suppose Schahfer 15 were run only when the marginal cost of its electricity was the lowest in NIPSCO's system. As the table early in this opinion shows, NIPSCO had a lot of capacity with lower variable costs than Schahfer 15, even once the I & M contract ended. Whether Schahfer 15 produced much electricity then would depend on how fast the system grew: if it grew quickly, the output from Unit 15 would be essential; if it grew slowly it would be a decade before Unit 15's power was needed; and if demand shrunk, Unit 15 could be sold for scrap. Relative cost of coal also was important, for a similar reason: change the relative economics of the units, and you change which units run. If coal at Mitchell (and for Schahfer 14) suddenly became cheap relative to CWI's coal for Unit 15, then Unit 15 would burn very little coal; reverse the relative prices, and you also reverse the effects.

Kent Anderson performed a multiple regression analysis to determine how sensitive the predictions of the coal demands at Schahfer 15 were to assumptions about the must-run condition, the growth of demand, and the relative costs of coal. His conclusion, in outline, is that if the cost of coal and the growth of demand had been what NIPSCO thought in the summer of 1982 they would be, then removing the must-run designation for Schahfer 15 would have made relatively little difference to the estimate of the amount of coal it would burn, but that removing the M designation *and* reducing the demand forecast *and* changing the relative delivered prices of coal would make a great deal of difference. Demand on NIPSCO's system fell substantially during the years in question, principally because the steel industry was closing plants and cutting output at plants that remained open. The decline of steel affected all the ancillary industries in Northern Indiana, as well as the size of the population (and thus residential demand). See PX 231 p. 16; Table at PX 175. I need not trot out the numbers in the regression. See Tr. 1053–86 and PX 237 (revised)—PX 243 (revised). I credit Mr. Anderson's conclusions.

NIPSCO itself generated a raft of PROMOD runs during and after the negotiation of the Contract. Every quarter it prepared a "base case" run, reflecting its best analyses at the time. "Base case" runs from 1982 through the first quarter of 1984—with a single exception to be discussed later—show essentially the numbers that also appeared in Exhibit I. Mr. Dunn's decision to revise the order of dispatch in spring 1984 was incorporated into PROMOD, and that, coupled with changes in price and demand assumptions that had been made during the interim, led to a big change in the PROMOD projections. These base case PROMOD projections then formed the basis of the annual estimates NIPSCO furnished to CWI under § 4.B of the Contract. Here are some selected PROMOD runs showing the nature of the change. The name of the run is its date. 832Q means "1983, second quarter"—NIPSCO's internal estimate 13 days after signing the Contract. All figures, which are from PX 256, are in thousands of tons. All runs are "base cases" (with the exception

of the run that produced Exhibit I), and in each case designations such as BASE or BAS have been omitted. (See also PX 232–34 for graphic presentations.)

| Year | Exh. I | 822Q | 823QB | 832Q | 834Q | 841QA | 843QF2 |
|------|--------|------|-------|------|------|-------|--------|
| 1982 | 1,062 | 1,062 | — | — | — | — | — |
| 1983 | 887 | 887 | 665 | 811 | 817 | — | — |
| 1984 | 1,059 | 1,059 | 769 | 1,010 | 945 | 824 | 605 |
| 1985 | 981 | 981 | 1,027 | 929 | 1,037 | 1,000 | 709 |
| 1986 | 1,029 | 1,012 | 1,021 | 988 | 877 | 589 | 233 |
| 1987 | 1,042 | 995 | 995 | 985 | 940 | 790 | 252 |
| 1988 | 1,102 | 1,102 | 1,037 | 997 | 954 | 1,021 | 548 |
| 1989 | 1,179 | 1,180 | 956 | 994 | 946 | 1,005 | 614 |
| 1990 | 1,052 | 1,052 | 1,016 | 933 | 950 | 1,077 | 738 |
| 1991 | 1,117 | 1,117 | 1,026 | 998 | 919 | 1,021 | 654 |
| 1992 | 1,000 | — | 1,039 | 1,004 | 1,028 | 1,126 | 662 |
| 1993 | 1,000 | — | — | — | 1,024 | 1,116 | 690 |
| Avg. | 1,043 | 1,044 | 955 | 965 | 949 | 957 | 571 |

This table shows that NIPSCO was using, for its own purposes, roughly the same numbers it furnished CWI. I conclude that NIPSCO acted in good faith in making available to CWI its best available estimates about Schahfer's requirements, using the actual operation of Unit 15 at the time and the same assumptions NIPSCO was using for all other corporate purposes. Until PROMOD was revised (in mid–1984) to include *both* lower growth projections and an alteration of the assumption about how Schahfer 15 would be used, the average estimated burns continued to fluctuate around 1 million tons per year.

### D

There is one curiosity in this table: run 823QB. This was the "budget base case" for fall 1982, the run NIPSCO used as the foundation for its 1983 corporate budget. The figures for 1985 and forward track the figures in Exhibit I, but the figures for 1983 and 1984 do not. How these figures came to be reveals something both about the operation of NIPSCO and the negotiation of the Contract.

Thomas Howarth, now retired, was the vice president of NIPSCO for "gas operations and fuel procurement" between 1977 and 1983. He was the principal negotiator of the Contract for NIPSCO and was responsible for other contracts as well. On his head lay the responsibility for the coal pile on the ground at Mitchell Station, the $52 million the PSC had excluded from NIPSCO's rate base. Mr. Howarth scorned fancy models like PROMOD. He testified at trial that he neither knew nor cared much about PROMOD; all he cared about was the day-to-day burn of coal. This is a strange attitude for someone in charge of negotiating long-term contracts, but Mr. Howarth is not on trial here. Neither Howarth nor any of NIPSCO's other negotiators had any responsibility for the dispatch (or other actual operation) of NIPSCO's units. His responsibility was to have available coal that would burn cleanly in the units, when the operations people decided to run them.

Howarth ordered coal, lots of coal, for the Mitchell station. Not all of it burned cleanly. What did not burn piled up, and up, and up. Stung by the exclusion from the rate base, Howarth tried to persuade the operations side of NIPSCO to burn up "his" coal pile. Since the operations people were having trouble with CWI's coal at Mitchell, they were not cooperating. The operations staff started shipping CWI's coal from Mitchell to Schahfer, where it worked; the rest of it lay idle at Mitchell. (NIPSCO ultimately moved the coal pile at Mitchell to Schahfer, and the coal pile at Schahfer to Mitchell.) Howarth, who could bear no more, fired off a memo (DX EE) directing the operations staff to burn the coal at Mitchell and cut back the burn at

Schahfer—both to accommodate the extra generation at Mitchell and to await the arrival of more CWI coal at Schahfer 15, where Howarth did not think he had an adequate stockpile.

Howarth had no authority to direct the operations staff to do anything. Like good bureaucrats, they ignored a memo from outside the chain of command. But a copy of Howarth's memo reached Venhuizen, who turned it over to *his* staff. Venhuizen's staff viewed Howarth's "directive" as a problem in modeling. How could PROMOD be tweaked to simulate the burn of more coal at Mitchell and less at Schahfer? The staff ultimately reset the designator of Schahfer from M (= must run) to P (= run weekdays and weekday evenings, but not nights or weekends) and changed the assumed costs of coal. Joseph Almasy, one of Venhuizen's subordinates, asked Howarth if this is what he had in mind; he apparently paid the request (like anything else about PROMOD) little heed and said yes (DX EL)—knowing (but not telling Almasy) that the operations staff had ignored him. Almasy and Venhuizen then ran a budget base case, using the Howarth assumptions because they were (they thought) the best available. So PROMOD, the victim of Garbage In, Garbage Out, dutifully reported a lower burn at Schahfer 15 in 1983 and 1984, but no significant change in later years (when the designation returned to M).

Although no one at NIPSCO paid any attention to this, and apparently no one on the negotiation team thought about it, someone at CWI did. The record does not reveal how, but it is clear that CWI's negotiating team learned of the estimate of 665 tons for 1983 and became concerned. CWI was contemplating a requirements contract and needed to know NIPSCO's requirements. Moreover, the variance between the 887 tons of Exhibit I and the 665 tons was large enough to suggest a problem in PROMOD, and CWI wanted to know where these numbers were coming from.

NIPSCO invited CWI to send people to Hammond, Indiana (NIPSCO's headquarters) to see what PROMOD was. In January 1983 CWI sent one of the members of its negotiating team (who knew nothing about models and computers) plus Ron Rominiecki, the controller of General Coal Co., who knew something about models and computers but nothing about the negotiations. (General Coal Co., now called Westmoreland Coal Sales Co., is like CWI a subsidiary of Westmoreland Coal Co. During 1982–83 General Coal was the sales agent for CWI's coal, and the final decisions about the contract were made by General and Westmoreland rather than by CWI.) By the time CWI's people arrived, the error in the 1982 budget base case had been corrected. Almasy and Venhuizen showed CWI's employees around and told them about the model. Almasy and Venhuizen, though, apparently did not know (or had forgotten) why 823QB had the glitch in 1983 and 1984; they told Rominiecki that the decline in projected burn was because Unit 15 would be on repair for a longer time than anticipated. And that turned out to be true—though serendipitously.

Rominiecki returned to Philadelphia, General Coal's headquarters, and made both oral and written reports of his visit. The written report (DX GH, PX 157) shows that the NIPSCO staffers were completely open with the CWI team and told CWI everything it wanted to know about the model. Rominiecki saw raw inputs and raw outputs, though he was not allowed to take anything with him. (Inputs and outputs contain commercially sensitive data, such as the prices charged by CWI's competitors.) The record also contains Rominiecki's handwritten notes before and during the visit (DX GF–1). I conclude on the basis of these notes and Rominiecki's report that CWI knew everything about PROMOD that it wanted to find out, and had a solid working understanding of the model.

Mr. Rominiecki knew that PROMOD gave only estimates, and he must have known that point estimates (1,022,000 tons is a point estimate) do not reveal an important piece of information: the degree of confidence that the estimate is correct and the probable error if it is not. The "confi-

dence interval" around the estimates is small, so long as Unit 15 is run when available. Relax that constraint and the confidence interval is large indeed. See PX 197 and PX 198, putting standard deviation bands around PROMOD estimates run by NIPSCO itself over the course of a few years. Rominiecki could have requested, but did not, the information essential to allow him to compute the confidence intervals around the point estimates of Exhibit I.

The output of BAS823QB (the full name of the fall '82 run) is a centerpiece of CWI's case. CWI observes that the numbers in this report diverged substantially from Exhibit I, yet NIPSCO did not furnish BAS823QB to CWI. Howarth never told CWI about these estimates or about his "directive" to change the burn. All of this is irrelevant, however. BAS823QB was modeling something that never happened. Computer models do not govern the burn at any unit. The operations staff pays no attention to the PROMOD outputs; the numbers are meant for budgeters and fuel buyers. PROMOD estimates what will happen when the operations staff dispatches the units in a certain fashion, and the units break down at predictable rates (though at unpredictable times). BAS823QB was a worthless estimate, because it did not reflect accurately how the operations personnel planned to run the system. Howarth, who ignored PROMOD from beginning to end, was not going to make anything of it; Robert Kelly, second in command of the negotiating team, apparently never heard of either Howarth's directive or this run of computer output. Kelly and Howarth continued to believe throughout the negotiations that Exhibit I was NIPSCO's best corporate estimate. As it turns out, they were right (although the estimate was way off). By the time the contract was signed, BAS823QB had been scrapped, and the best estimate soon to be produced with data current on April 13 was remarkably close to Exhibit I. (The base case in use within NIPSCO on April 13, BASE831Q, is very similar to BASE832Q and therefore was not repro-

duced in the table.) CWI in fact *had* NIPSCO's best internal estimates.

One final point about BAS823QB. CWI implies that NIPSCO clung to that estimate longer than NIPSCO claims. In the spring of 1983 NIPSCO applied for an increase in the rates at which it sold power to a co-op for resale at retail. These rates are regulated by the Federal Energy Regulatory Commission. NIPSCO filed its application, with supporting documentation, in March 1983. The documentation included the budget based on BAS823QB—which was, except for the juggling of the burn between Mitchell and Schahfer, the best guess going. The FERC's rules require the utility to give the actual data for a "historical test year" (NIPSCO chose 1981) and then the estimates for a projected future test year. These projections must be filed no later than 15 months after the close of the historical test year, here by the end of March 1983. NIPSCO obviously used the same data that underlay its 1983 budget, which it was submitting to FERC. NIPSCO had been gathering data for the projected test year for more than six months before NIPSCO revised its budget for 1983 after correcting its PROMOD runs. NIPSCO had two alternatives: to submit the original 1983 budget warts and all (and from the point of view of NIPSCO, and its future rates, the error in BAS823QB was scarcely a pimple) or to recalculate everything, miss the March 1983 deadline, and have to start again with a new test year. The choice was clear: NIPSCO submitted the error and met the deadline.

The customer (the Wabash Valley Power Association) then asked NIPSCO for its best available projections. In June 1983, NIPSCO, understanding this as a request for the data it had submitted to FERC, sent Wabash BAS823QB. Wabash could not have cared whether CWI coal was burned at Mitchell and Medicine Bow coal at Schahfer, or the reverse; there is no indication that it was annoyed by the error. This is the last anyone heard of BAS823QB—until this litigation. I trust that BAS823QB, its place in Federal Supplement secure, can rest in peace.

E

■ Shortly after the parties signed the contract, Howarth retired. NIPSCO appointed a new team to procure coal and administer coal contracts. In the fall of 1983 one of the members of the new team told CWI that NIPSCO needed a reduction of $15 per ton in the delivered price of coal (which was then about $65 per ton). Tr. 1321–24, 1820–23, DX HX, DX IS. The reduction would be split evenly between CWI and the railroads hauling the coal. NIPSCO had opened negotiations with its railroads for a contract to carry coal (permitted under the Staggers Rail Act of 1980), and after extended negotiations finally achieved a significant reduction in the price of transportation. CWI takes this demand for a price concession as a sign of NIPSCO's bad faith in determining its requirements. I do not so understand it. NIPSCO's negotiators did what one would expect at a time when spot prices were falling and NIPSCO was under increasing pressure from its customers to reduce the price of fuel (fall '83, as I have recounted, marked the first coordinated opposition by the steel industry to a request for a fuel-adjustment increase). CWI had itself raised the possibility of a price reduction for sales over one million tons; NIPSCO could hardly be forbidden to explore the possibility of a reduction for other sales. It is not commercial bad faith to talk price with a supplier.

CWI also maintains that even in the fall of 1983 Unit 15 was not being run when available, Tr. 1932, 2072–73, implying that NIPSCO changed the status of Unit 15 before the Economy Purchase Order. This is a misunderstanding. In the fall of 1983 Schahfer 14 was undergoing environmental shake-down tests, which required that it be run near full power. The figures I have already given show that NIPSCO could not run Unit 14 at full power and still have Unit 15 on line during slack periods. Mr. Dunn testified that Unit 15 was taken off the line for something short of 30 days while Unit 14 was running full blast. Accommodations of this sort would not affect the long-run burn of coal at Unit 15 and do not show knavery. A time doubtless would come when Unit 15 would be run full blast and Unit 14 would be turned off during the interim; these things balance out. That one such episode occurred in the fall of 1983 shows nothing.

A final point about NIPSCO's good faith in determining its requirements. Much of the delivered price of CWI's coal is rail transportation. In April 1983 NIPSCO was paying about $29 per ton under a special tariff negotiated with the Denver & Rio Grande Western Ry., the carrier originating the movement at CWI's Orchard Valley mine in western Colorado. The D & RGW negotiated with other railroads for their share of the transportation, paying them out of the $29. By 1986 NIPSCO had negotiated separate contracts with each carrier, getting them to bid against one another for larger portions of the movement. (It is possible to interchange the cars at different junctions, so the length of each carrier's haul is in NIPSCO's control, within limits.) CWI says that NIPSCO should have negotiated these contracts sooner, reducing the delivered price and increasing the burn of CWI's coal. NIPSCO replies that it was hard to negotiate with the D & RGW, which is the only carrier serving the Orchard Valley mine and therefore in a position to extract the consumers' surplus of the whole movement.

The parties and expert witnesses debated for some length whether NIPSCO did the best it could, or even acted prudently; the views are conflicting. Compare Tr. 2206–19 with Tr. 2293–2302. I need not resolve them. NIPSCO acted in good faith toward CWI. The contract with the D & RGW was only the third NIPSCO achieved; even today much of NIPSCO's coal moves on tariffs rather than contracts. NIPSCO never got a contract to move the Carbon County coal from Wyoming to Indiana. Commercial good faith does not imply optimal conduct. NIPSCO's ratepayers may regret the time it took NIPSCO to strike a deal with the railroads; alternatively, they may find that by holding out NIPSCO got better terms (as NIPSCO claims). Either way, CWI has no legitimate beef.

F

I conclude:

1. NIPSCO furnished in good faith, and CWI possessed, NIPSCO's best estimates about Schahfer 15's requirements. The estimates in Exhibit I were accurate as of the date the Contract was signed. CWI knew what PROMOD was and the fundamental assumptions that were responsible for the estimates in Exhibit I.

2. The estimates in Exhibit I arose from assumptions about demand for electricity, price of coal, and use of Schahfer 15 that were reasonable at the time.

3. John Dunn, who was and is responsible for dispatching NIPSCO's system, intended throughout 1982 and 1983 to keep Schahfer 15 on run-when-available status for the foreseeable future. But for the Economy Purchase Order, Mr. Dunn would have done this to maximize the reliability of the supply of energy.

4. Dunn's alteration of the dispatch criteria was a reasonable response to the EPO. Even though it was not the only possible response, Mr. Dunn's response reduced the cost of generating power below any alternative that retained Unit 15 on run-when-available status. The PSC was delighted with NIPSCO's changes and believed that they complied with the EPO.

5. Neither NIPSCO nor CWI foresaw the EPO or the alteration of NIPSCO's dispatch criteria. Attorneys for both the Utility Consumer Counselors' Office of the PSC and the industrial intervenors testified that the PSC had never entered any similar order. They, like Dunn, testified that the order surprised them. I conclude that everyone was surprised by the order. To the extent they should not have been surprised—because the high costs of NIPSCO's system put handwriting on the wall in light of the pressure from customers to cut costs and the statutory obligation to hold costs down, see Ind. Code § 8–1–2–42(d)(1)—CWI also should not have been surprised. In fact, for reasons covered in Part II, CWI was *less* surprised than NIPSCO because Charles Mann, a consultant at Dames & Moore, told CWI about the risk that NIPSCO would find Unit 15 uneconomical to run in a different system of dispatch. No one is required, however, to predict administrative novelties.

6. After changing the dispatch criteria in the spring of 1984, Mr. Dunn operated Unit 15 in the same way as any other. NIPSCO did not manipulate its requirements at Unit 15 to take advantage of the contract with CWI. NIPSCO reduced its burn at Unit 14 by *more* than it cut the burn at Unit 15 (see PX 231 pp. 18–19) even though it had a take-or-pay contract for coal at Unit 14. (The Carbon County contract, for which NIPSCO has paid dearly.) Had NIPSCO been proceeding in commercial bad faith, it would have done the opposite, running Unit 14 while closing Unit 15. The reduction in the burn at Unit 15 occurred because of a combination of the change in the order of dispatch (a sine qua non), the decision to purchase economy power against the marginal production of the high-cost units, the reduction in the demand for NIPSCO's power, and a decline in the price of spot, high-sulfur coal compared with CWI's coal. None of these was anticipated in April 1983, and it was commercially reasonable not to have anticipated them.

■ These findings mean that NIPSCO did not defraud CWI into entering the Contract or setting its price, and that NIPSCO has arrived at its requirements in good faith. See *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 877 (Ind.App.1983) (fraud means a representation known to be untrue when made, or an untrue representation recklessly made).

II

The circumstances that led to the reduction in the use of coal at Schahfer Unit 15 would be irrelevant if NIPSCO had a fixed-take ("take-or-pay") contract. The *Carbon County* case establishes that. CWI insists that it *has* a take-or-pay contract with NIPSCO, whether because Exhibit I establishes contractual minima (the contract claim) or because NIPSCO's negotiators promised that the assumptions underlying the Exhibit I numbers would be unchanged and that

CWI relied to its detriment on these representations (a promissory estoppel claim). Most of the time at trial was spent on the negotiating history of the Contract. I overruled NIPSCO's objection, based on the parol evidence rule, to the entire inquiry; I also declined to hold that the limitation on warranties in § 25 of the Contract is such a clear "entire agreement" clause that extrinsic evidence was precluded. I had planned to explain in this opinion the full basis of these rulings. As I credit the testimony of NIPSCO's witnesses, however, these rulings are no longer important. Any error in these rulings is in CWI's favor, so I do not deal with the subject further. Moreover, although I ruled before trial that CWI has the burden of proof (= risk of nonpersuasion) on all matters dealing with promissory estoppel and fraud, I do not discuss this ruling either. I would make the same findings if NIPSCO had the burden. This is not the sort of close case in which tie-breaking rules (which is what risks of nonpersuasion are) matter. The allocation of the burden in a combined declaratory judgment and breach suit of this sort is a matter of some delicacy, and discussion should be reserved for a case in which the allocation affects the outcome.

A

Messrs. Howarth and Kelly were NIPSCO's principal negotiators. Two other people attended one or more sessions for NIPSCO but have little to add, and I do not discuss them. John V. Bickford, the president of General Coal, was CWI's chief negotiator. Other members of the team included Daniel J. Snyder and C.K. Seglem, the presidents of CWI (Snyder through fall 1982 and Seglem since); Joseph W. Rowland, a vice president of General Coal; and Ronald J. Chesnos, the contract administrator of General Coal (the person in change of implementing any agreement reached). Pemberton Hutchinson, president and chief operations officer of Westmoreland Coal, and the board of directors of Westmoreland Coal, made the final decision to sign the Contract.

Messrs. Howarth and Kelly disdained the written word, but the team from CWI was full of compulsive note takers. The record teems with contemporaneous handwritten notes, typed summaries of meetings, and inter-corporate memoranda. All of the people who attended the negotiations testified about the representations that were made, if any. Howarth could remember very little, even after reviewing the notes CWI's negotiators took. He remembered essentially one thing: that he was ashamed of the coal pile at Mitchell, was not going to sign a fixed-take contract again, and told CWI so. Kelly remembered more. He said that he told CWI what the Exhibit I figures represented (a PROMOD run, which is to say an estimate) and informed CWI of the current operational status of Schahfer 15 (as a run-when-available unit) but made no promises of any kind about how NIPSCO would use Unit 15 in the future. He also testified that he told CWI repeatedly that NIPSCO would not promise to burn a single ton of coal at Schahfer 15 (Tr. 583-91, 2097-98).

All of CWI's negotiators denied that Kelly had made any such statement. All of them testified that they understood Exhibit I as a promise to take *at least* the amount of coal specified, that NIPSCO's negotiators were upbeat about the prospect of greater burns, that NIPSCO implied—directly or through the assumptions underlying Exhibit I—that Unit 15 would remain a run-when-available generator and never informed them that the operating status of Schahfer 15 was subject to revision. Several even testified that they were told that Unit 15 was a "baseload" unit, which in industry parlance means a unit run constantly at maximum efficient output—in other words, supplying the "base load" of the system, while other generators are brought on line or spun up to meet peak loads.

The only flat contradiction in the testimony concerns the "not one ton" statement. I conclude that Kelly was truthful. His demeanor suggested that he was trying to tell as much as he could remember about the meetings. CWI repeatedly requested that a minimum tonnage clause be added to

the contract; NIPSCO repeatedly refused to consider such a clause; presumably NIPSCO said *something* when sweeping that proposal off the table, but no one from CWI could remember what that something was. I think it likely that a phrase such as "we will not guarantee to take one ton" is a logical thing for Kelly to have said at the time and is consistent with his character.

As for the rest, there is little disagreement. I conclude that NIPSCO represented that Schahfer 15 was run when available and that the run-when-available assumption was part of the PROMOD estimate that created Exhibit I. (NIPSCO's witnesses sometimes also used the word "baseload", but it was clear from the fact that it had never burned much more than one million tons per year that Schahfer 15 was not being run anywhere near maximum capacity. At maximum it would burn 5,000 to 6,000 tons per day, or almost two million tons in a 325–day year. CWI could not reasonably have concluded from the use of this word that NIPSCO was promising to run Schahfer 15 at maximum.) None of CWI's witnesses testified directly that NIPSCO promised to *keep* Unit 15 on run-when-available status come what may, and to the extent they testified that such a promise was implied, I do not credit their testimony. I conclude that NIPSCO did not make such a promise, and also did not promise to disregard economic considerations in the dispatch of its units. CWI knew that NIPSCO used marginal costs to decide whether to run Schahfer 15 at more than minimum state; CWI's negotiators also knew that NIPSCO's negotiators had no control over the operation or dispatch of NIPSCO's system; there was no promise to make current conditions the limit of NIPSCO's discretion.

In concluding that NIPSCO made no firm promises to CWI, I have considered several matters other than the testimony and demeanor of the witnesses. One is the nature of the contract itself. It is written as a requirements contract. If NIPSCO were promising to maintain the current (as of 1982–83) operating status of Unit 15, there would have been no reason to negotiate a requirements contract. Unit 15 was guaranteed to burn a million tons a year as a run-when-available unit. CWI's witnesses said that the contract took the requirements form only to ensure that if CWI's coal did not burn cleanly at Unit 15, NIPSCO could call off the purchases. But there is a separate quality-assurance provision in § 10 of the contract; it was unnecessary to draft the deal as a requirements contract to cover environmental and quality concerns, given § 10.

A second matter is that *none* of CWI's contemporaneous notes and memoranda refers to any of the promises that CWI now says were made. CWI's witnesses freely admitted that the quantity of coal to be sold was the central subject of the negotiations. Yet none of the notes says anything like: "Howarth promises to operate Schahfer 15 as a baseload unit for 10 years." The words "baseload", "run-when-available", and "must-run" do not appear in anyone's notes. The closest is a marginal notation in Snyder's notes of the September 1982 meeting multiplying 323 by 5,000 tons. DX ER. Snyder now says that he did this because CWI had been promised that Unit 15 would run as a baseload unit. Given the nature of the contract being signed—which limited CWI's obligation to 1.25 million tons per year—it is exceedingly unlikely that this calculation represented what CWI *expected* to sell on the basis of representations made. Instead it represented the *maximum* Unit 15 would burn under favorable conditions, an amount way in excess of the Exhibit I figures. I could go on but will not. I conclude that if CWI had been told in 1982–83 what it says it was told, some notations would have been made; none was.

Third, much testimony was to the effect that Howarth and Kelly represented that Exhibit I was the minimum Unit 15 would burn. It is possible that Howarth and Kelly said this, accompanied by an explanation that they expected the steel industry to pick up. Everyone knew that NIPSCO's fate is tied to the steel industry's. CWI's negotiators conceded that they, too, were bullish on steel. These shared beliefs about a better tomorrow may have been

one of the reasons CWI was willing to take the risk of a requirements contract. But CWI's personnel knew that Exhibit I came from a PROMOD run, and they knew after the Rominiecki visit that PROMOD generated expected values. No (sane) businessman takes an expected value, a maximum-likelihood estimate, as a *floor*. It is the pivot around which variance will occur. Variance is the only certainty. When CWI's negotiators testified that they looked on Exhibit I as a floor (even with steel in decline), despite knowing ὃ nature, that led me to believe that they were not entirely candid in describing what was said at these meetings.

Fourth, many of the memoranda circulated within CWI debating whether to sign the Contract, and discussing its implementation, assume that NIPSCO has no obligation to burn any particular amount of coal at Schahfer 15. For example, Snyder's memo written as he left as president of CWI contained stern warnings about the lack of any assurances, DX FQ, and the memo reporting the discussion at a heated meeting within CWI in December 1982 flatly states:

> We could be at risk, upon 30 days notice, that we would have no sales for the CWI mine and would either be forced to reduce the work force and/or sell the coal at unprofitable prices.... We need to secure from NIPSCO some assurance that they will take some minimum tonnage during the first few years of the contract.

DX FO, p. 2. CWI's witnesses attempted to explain these statements away. Snyder, for example, says that he hadn't really read the text of the contract when he sent his memo, and Chesnos, the author of the notes of the meeting, says that only Snyder had expressed the concerns. But the notes themselves portray the proposition as a consensus of the group and the basis of a corporate decision to obtain a minimum-take obligation, something CWI never got. I conclude that CWI's contemporaneous writings, and not the testimony of CWI's witnesses, represented CWI's understanding of the risk it was taking.

Not a single one of these memos mentions any representation made during a negotiating session to support a contrary view. This is significant because there was a serious debate inside CWI about the wisdom of signing this Contract; I would expect the proponents to rely on assurances from NIPSCO, if there were any assurances. The memos from the pro-Contract side do not mention any assurances; instead they rely on (1) the up-side potential of the contract if NIPSCO's demand picks up, and (2) the advantage of a contract without a "price reopener". DX FO, p. 1; PX 136; PX 144. The 1977 contracts contained a "price reopener" that allowed the parties to renegotiate price at five-year intervals and permitted either side to walk away from the deal if agreement were not reached. The reopener would be activated in 1985, and at least some people at CWI feared what NIPSCO would do. The 1983 Contract, lacking such a reopener, was preferable to these people.

One of CWI's proposals in February 1983 also demonstrates that CWI did not think it had any promises from NIPSCO about how Unit 15 would be operated. CWI proposed a 900,000-ton "walk away" provision. PX 159; cf. DX GK. Under this clause, if NIPSCO ordered less than 900,000 tons in any year, CWI could decline to fill the orders and cancel the contract. If CWI already *had* promises (through Exhibit I or oral representations) that NIPSCO would take at least a million tons, this clause was pointless. Failure to take the tonnage required is breach; CWI could have walked away on breach. Yet it proposed—and NIPSCO rejected!—a clause that on CWI's reading of the negotiations did nothing except repeat what the Uniform Commercial Code already provided. The episode of this clause establishes that CWI did not have in hand the promises about minimum quantities it wanted.

I do not conclude that CWI's witnesses were deliberately untruthful. A man hears what he wants to hear, and disregards the rest. Paul Simon, "The Boxer" (1968). CWI's negotiators wanted to hear assurances about the performance of Schahfer 15. What they got were statements of fact

such as "the PROMOD shows the estimated burn of ..." and "Schahfer Unit 15 is run when available" and even "we do not plan to change how Schahfer Unit 15 is used". These statements were true. CWI then inferred that NIPSCO's current operations would continue. An inference by one party to a conversation may be the basis of a great business deal. If steel had picked up, if there had been no Economy Purchase Order, CWI would be in clover today. But inferences are not legally binding.

CWI also knew that the assumptions underlying Exhibit I might not hold forever. Snyder hired Charles Mann, of Dames & Moore, to do a study of NIPSCO's system. Snyder did not give Mann any constraints (as one might have expected, if CWI possessed promises from NIPSCO about how Schahfer 15 would be used). Using only publicly available data, Mann concluded that Schahfer 15 was likely to burn about 500,000 tons per year during the next 10 years if free to run as costs dictated. DX FB, DX FC. Westmoreland's other principals did not respond with a yawn, which would have been appropriate if CWI had a promise of a minimum take represented by Exhibit I; the Mann report received close attention. In the end CWI decided to take a business risk for reasons it found sufficient.

The business assumptions underlying a contract are not legal obligations. The assumptions of a computer model do not commit the firm to live up to them. CWI knew that the model predicts the consequences of the operational decisions and does not direct how any operational decision is made. Predictions are not warranties. NIPSCO's negotiators emphatically did not *promise* that today's operational rules would apply for ten years, and without that promise the basis of CWI's promissory estoppel case evaporates. *Citizens State Bank v. Peoples Bank*, 475 N.E.2d 324, 327 (Ind.App,1985).

### B

■ The discussion so far disposes, on wholly factual grounds, of CWI's fraud and promissory estoppel claims. CWI also relies on the negotiating history of the Contract to contend that even if NIPSCO may take less than the estimates in Exhibit I, it may not do so for economic reasons. To evaluate this claim it is necessary to trace the evolution of § 4.G of the Contract.

One should start, however, with the text of § 4.G and with one of the important details of the negotiation. These mean more than what was left out of § 4.G. The text that was left in appears to give NIPSCO unqualified authority to run Schahfer 15 as it pleases and to purchase power when it wants. NIPSCO promises only to use CWI's coal when it runs Unit 15. This promise was of value to CWI because everyone thought Unit 15 would burn a lot of coal. But at least on the surface of the contract, that is all CWI got.

The important detail is that CWI pressed repeatedly for a minimum-take rule. At the first negotiating session, in September 1982, CWI proffered a minimum-take clause with a blank for the minimum tonnage (DX EP). NIPSCO would not accept such a clause even on a fill-in-the-blank basis. In 1983 CWI proposed the 900,000 ton walk-away figure (PX 159); NIPSCO would not stand for that either. Minimum takes were raised orally on other occasions and invariably rebuffed. The contract contains no commitment, just the million-ton estimate. CWI never even bothered to ask for a premium price if orders did not live up to the Exhibit I estimates—though a premium price had been the central feature of the 1980 renegotiation that reduced NIPSCO's obligation to less than a million tons a year. The changes in § 4.G must be understood against the background of these dominating features of the negotiations.

Howarth and Kelly prepared the initial draft of a contract and sent it to CWI on July 23, 1982. PX 129, DX EI. This draft did not contain a provision parallel to the eventual § 4.G. CWI made a counterproposal. At the first meeting, held on September 3, 1982, NIPSCO gave CWI Exhibit I (referenced in but not attached to the July draft) and a completely revised § 4. DX ET. Section 4.G of this draft provided:

G. Nothing contained in this Agreement shall be construed to require the use of coal for generation of electrical energy or to prohibit Buyer from utilizing any and all other or substitute sources of energy as may become available; nor shall anything in this Agreement be construed to require the purchase of more coal than needed for the operation of Buyer's Schahfer Unit 15; nor shall anything in this Agreement be construed to cause Buyer to operate Schahfer Unit 15 to any greater extent than Buyer in its sole discretion deems prudent, either as to hours of operation or as to load carried on said Schahfer Unit 15, nor shall anything in this Agreement be construed to prevent Buyer from operating any and all of its generating stations, including Schahfer Unit 15, and utilizing other sources of power supply in the most efficient, economical, and prudent manner for the production and supply of electrical energy for Buyer's Customers; nor shall anything in this Agreement be construed to cause Buyer to exceed its maximum reserve stockpile requirement allowable in rate base determinations as established from time to time by the Public Service Commission of Indiana applicable to Schahfer Unit 15.

After the meetings of September 3 and December 21, § 4.G had assumed its final form. That meant four principal changes: the first and third clauses of the September 3 draft were deleted; the stockpile clause referred to a "reasonable" stockpile instead of the one fixed by the PSC; and a new last sentence referring to fair treatment was added. The parties disagree about what these changes mean.

All witnesses agreed that the first clause disappeared because CWI was worried about NIPSCO's substituting some source of energy other than CWI's coal to fire the boiler at Schahfer 15. NIPSCO was willing to make a "requirements" commitment and therefore struck the language. Several of CWI's negotiators testified that they thought the deletion had an additional meaning: striking the reference to "substitute sources of energy" meant to them that NIPSCO could not substitute purchased power for power from Schahfer 15. I disregard this for several reasons.

One, this belief was not communicated to NIPSCO's negotiators. What the parties say to each other shapes the meaning of their contract; what one negotiator privately believes about the language usually is unimportant. *Western & Southern Life Insurance Co. v. Vale*, 213 Ind. 601, 12 N.E.2d 350, 354 (1938); *Crabtree v. Lee*, 469 N.E. 476, 479 (Ind.App.1984); *Wallace v. Rogier*, 182 Ind.App. 303, 395 N.E.2d 297, 301 (1979); see also *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–15 (7th Cir.1987); E. Allan Farnsworth, *Contracts* 113–16 (1982). Intent might matter if the circumstances show clearly that whatever led this negotiator to the belief would have led others to the same belief without the need to exchange words. The proposition that excluding the first clause from the September 3 draft prevents buying electricity as well as oil is not so evident that everyone should have reached that conclusion independently. Second, as things turned out NIPSCO did not significantly increase its purchases of power, and now, phasing out the I & M contract, is substantially reducing them, so different readings of the deletion are insignificant. Third, CWI's interpretation of the deletion is incoherent, because the negotiators left in § 4.G express permission for NIPSCO to use "other sources of power supply". I conclude that the negotiators meant to distinguish other sources of "energy" (that is, sources of BTUs to run Schahfer 15) from other sources of "power supply" (that is, sources of electricity for NIPSCO's customers). NIPSCO could import power but not BTUs.

The effect of deleting the third clause is harder to piece together. CWI relies heavily on the fact that the negotiators deleted this language, which gave NIPSCO "sole discretion" over the operation of Schahfer 15. This means, CWI says, that NIPSCO may not use principles of economic dispatch that lead to a lower burn at Unit 15. Yet the next clause, which was left in, refers to principles of "efficient, *economical*, and prudent operation" (emphasis add-

ed), which NIPSCO may use. None of the witnesses could recollect any words exchanged on the deletion of this clause; none of the handwritten notes or memoranda refers to this clause. The most any witness could recall was his belief about the effect of the deletion, but I have already explained why private beliefs do not govern.

I end up accepting Kelly's explanation for the deletion, though without great confidence that the parties thought through the tension between removing this clause and leaving the next one intact. Kelly believes that CWI was concerned that the third clause would have allowed NIPSCO to operate Schahfer 15 in an irrational or strategic manner. It would be irrational, for example, to shut down Unit 15 until Seglem's daughter married Howarth's son, yet the third clause might have allowed NIPSCO to do this; it would be strategic to shut down Unit 15 until CWI agreed to a price reduction, yet the third clause might have allowed NIPSCO to do this. Accordingly Kelly interprets the deletion of the third clause as reinforcing the fourth clause: NIPSCO may use economic and efficiency criteria to dispatch Unit 15 (and so determine its requirements), but may not use other, opportunistic or random criteria. This makes sense of the deletion, and no one at CWI offered a better explanation for taking the third clause out while leaving the fourth clause in. I have already held that NIPSCO operated Schahfer Unit 15 either as a run-when-available unit or on economic-dispatch criteria, in good faith and a commercially reasonable way, after signing the Contract, so this approach to the deletion (and what remains) does not offer succor to CWI.

The third change—the reference to a "reasonable" stockpile—does not affect this litigation, so I shall not discuss it. On the last day of trial CWI informed me, Tr. 2332–33, that it was not pursuing NIPSCO's apparent failure to maintain an adequate stockpile during the latter part of 1985 as an independent violation of the contract.

The final change was the addition of the "fair treatment" sentence at the end of § 4.G. Seglem apparently suggested this at the meeting of December 21. Section 4.E of the draft already required CWI to treat NIPSCO fairly in times of shortage, and Seglem thought it would be only fair for NIPSCO to be fair in return. Before the addition of this sentence, § 12 (the force majeure proviso) also required NIPSCO to treat CWI fairly; what could be wrong with reassurance? NIPSCO was not opposed—who is against fair treatment?—and agreed to the addition.

Fairness is a wonderful objective, but it usually means "playing by the rules"; it is "fair" to make a hard tackle in football, and in business it is fair to buy from a rival whose price is less. Fairness also may mean equal treatment, but "equal *with respect to what*?" is the central question. Seglem testified that the "what" in this expression is the purchase of coal. NIPSCO was free to cut its purchases of coal from suppliers in hard times, Seglem believed, but not to cut CWI's by more than any other supplier's. NIPSCO has increased its purchases of high-sulfur coal as it reduced the burn at Schahfer 15, so Seglem (and the other CWI negotiators) believe it is out of compliance with the fairness clause.

Kelly gave a completely different interpretation (Tr. 599–601). Kelly treated the language in § 4.G as redundant with the language in § 12 on force majeure: "In the event of force majeure affecting the accepting or unloading of the coal by Buyer which affects Schahfer Unit 14 and Schahfer Unit 15, Buyer shall treat Coal Company no less fairly than any of its other producers of coal." The parties agree on the meaning of this "fairness" clause. Units 14 and 15 share one coal tipple. All coal for both units is unloaded at a single place. If the tipple should malfunction, and NIPSCO should be unable to unload from the rail cars all the coal it has ordered for both Units 14 and 15, it must cut back its take ratably between the units. Kelly says that the language in § 4.G means the same thing.

There are two problems with Kelly's interpretation: first, it makes the language in § 4.G redundant; second, apparently no one conveyed this meaning to CWI. I have already inveighed against secret understandings of meaning. Redundancy may be more understandable. This contract was not drafted like a bond indenture, and perhaps both sides were a tad careless (or perhaps NIPSCO was willing so cheerfully to agree to the language because it thought the addition unnecessary). Howarth testified that he thought the fairness language in § 4.G had some additional meaning, though he could not say just what.

I do not adopt the meaning Seglem gives this language, because no one expressed it orally at the meeting of December 21. Such a sweeping interpretation of "fairness"—one that would put price and therefore efficiency considerations off limits to NIPSCO—would undo the rest of § 4.G. If that is what the negotiators meant, surely someone would have said so. I think that the fairness sentence in § 4.G takes its meaning from still a different problem: CWI's concern that as the only supplier to NIPSCO on a requirements contract, it would be the first cut back. CWI knew that Carbon County had a fixed-quantity contract to supply Schahfer 14 and that other suppliers also had long-term contracts with take-or-pay features. Seglem feared that NIPSCO would respond to a decline in demand by turning off Schahfer 15 while continuing to take the coal required by the other contracts. See also DX FB, p. 2 (Snyder).

The "fairness" language therefore prevents NIPSCO from favoring suppliers on take-or-pay contracts over CWI in order to avoid liability on those contracts. It does not, however, preclude NIPSCO from using principles of economic dispatch that look at the *cost* of coal rather than at the structure of the contract. The rest of § 4.G preserves NIPSCO's right to do just that.

NIPSCO did not violate the "fair treatment" rule, so understood. It did not favor Carbon County Coal over CWI; in fact it broke its contract with Carbon County while continuing to buy from CWI. Much of the increase in the purchases of high-sulfur coal came on the spot market. Spot market purchases come at the expense of fixed-take suppliers (such as Carbon County) as much as they come at the expense of CWI. NIPSCO ran Units 14 and 15 with reference to the actual cost of the coal rather than the structure of the contract, which is all this language requires. (For a short period in 1986 NIPSCO treated the marginal cost of Carbon County coal as almost zero and throttled up Unit 14, but this was an offshoot of the litigation about the Carbon County contract and did not affect the longer-run burn at Unit 15. CWI has not advanced this episode as an independent violation of the Contract.)

### III

These findings are sufficient to bring the case to a close. CWI's arguments based on fraud, promissory estoppel, and commercial bad faith in determining Schahfer 15's requirements have been rejected on the facts. This leaves principally CWI's argument that NIPSCO could not use economic criteria to reduce the burn at Unit 15, when Unit 15's relative inefficiency was known in 1983.

To the extent this is a variation of the claim that NIPSCO knew (or had to know) as of April 1983 that it would soon stop using Schahfer 15 on a run-when-available basis, I have rejected it. NIPSCO changed its method of operation in good faith and not as a result of a prior plan. Representations during the negotiations were factually true. And Indiana does not allow recovery in a contract or fraud case to be based on projections and predictions that turn out to be mistaken. *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1412–13 (7th Cir. 1986) (collecting and discussing Indiana sources); *Sachs v. Blewett*, 206 Ind. 151, 185 N.E. 856 (1933); *Captain & Co. v. Stenberg*, 505 N.E.2d 88, 96 (Ind.App.1987).

To the extent it is a raw proposition of law, it is unavailing. CWI relies on Official Comment 3 to § 2–306 of the Uniform Commercial Code, Ind. Code § 26–1–2–306, which addresses requirements contracts:

If an estimate of output or requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

This comment, like the whole UCC, is just a presumptive rule. Parties may vary the treatment as they like. NIPSCO demanded, and got in § 4.G, a clause that allowed it to use economic criteria to set Unit 15's requirements. Section 2–306 does not make this clause illegal. It will be enforced.

Moreover, neither this comment nor § 2–306 itself purports to put economic desiderata out of bounds. Instead it constrains the range of variance when the parties do not do so themselves. As the text of § 2–306(1) puts it, a requirements term "means such actual ... requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate ... may be tendered or demanded." Good faith is the benchmark, and merchants customarily consider prices. To refer to cost is not commercial bad faith. I have found that NIPSCO acted in commercial good faith in determining the requirements of Schahfer 15.

The independent limit on variance from an estimate is of slight importance here, for three reasons. One, NIPSCO has taken more than 55% of the estimate in Exhibit I in each year of the contract save for the aberrational 1986; the parties have not brought to my attention any case holding that a 45% variance is too much. Two, the parties themselves decided to put bounds on the variance. The Contract provides that if NIPSCO's requirements exceed 1.25 million tons per year, CWI may decline to supply the excess. CWI wanted to put in a lower bound of 900,000 tons a year (the walk-away clause), but NIPSCO would not agree. It is not appropriate for a court to read into the Contract as a standard-issue term a clause that the parties dickered over explicitly and did not include.

Three, as I read § 2–306(1), the limit on variance works one way only: in a requirements contract the buyer cannot unduly increase its requirements by changing the way it does business; in an output contract the seller cannot unduly decrease its output. See Ronald A. Anderson, *Uniform Commercial Code* § 2–306.23 (3d ed. 1982). Otherwise a requirements contract at a price that becomes advantageous to the buyer would allow the buyer to become the middleman to the world, suddenly deciding to sell the product in bulk or building new plants and "requiring" vast quantities. This has been a problem in the electricity business. See *Globe Woolen Co. v. Utica Gas & Electric Co.*, 224 N.Y. 483, 121 N.E. 378 (1918); *Utah International, Inc. v. Colorado-Ute Electric Ass'n*, 425 F.Supp. 1093 (D.Colo.1976); *Lakeland v. Union Oil Co.*, 352 F.Supp. 758 (M.D.Fla.1973). The whole idea of a requirements contract is that a buyer takes no *more* than it requires; if it determines these requirements in commercial good faith (the explicit statutory requirement), the fact that the requirements turn out to be unexpectedly small is of no moment. The legally relevant restriction is that NIPSCO set its requirements in commercial good faith, see generally, *Lambert Corp. v. Evans*, 575 F.2d 132, 138 (7th Cir.1978), which I have concluded NIPSCO did.

■ The final substantial argument I need consider is CWI's contention that § 4.F of the contract requires NIPSCO to purchase, over the course of the year, the full amount of coal specified in the annual estimate sent pursuant to § 4.B. Section 4.B itself just calls for a letter advising CWI of "the quantity of coal [NIPSCO] estimates it will require" in the coming year, which creates no obligation. Section 4.F then says that the amounts ordered "shall in the aggregate approximate the tonnage specified pursuant to paragraph B above." CWI treats this as making the "estimate" of § 4.B mandatory.

This is a linguistically possible reading, but it is implausible in the context of this commercial relationship. NIPSCO wanted

a contract that would avoid unnecessary coal piles (the $52 million embarrassment at Mitchell), and it achieved this by tying its purchases to Schahfer 15's actual burn. Section 4.B calls the annual letter an estimate, which it has to be because it is sent 15 months before the last month of the year in which the coal will be burned. Only the monthly notices are referred to as "orders", and there is a big difference between an estimate and an order. Section 4.G makes it clear that the actual requirements of Unit 15 govern by stating: "*Nothing* contained in this Agreement shall be construed to require the purchase of a quantity of coal greater than is needed for the operation of Buyer's Schahfer Unit 15" (emphasis added)—and the excluded "nothings" must include § 4.F as well as Exhibit I. I conclude that § 4.F, taken as a whole, was designed to induce NIPSCO to spread its orders evenly through the year, to facilitate efficient production at CWI's mine. NIPSCO would handle seasonal fluctuations through a change in the size of its inventory. The requirement that the monthly orders aggregate the annual estimate was designed only to create the benchmark against which equality would be measured. NIPSCO was supposed to start the year by ordering, each month, one-twelfth of the annual estimate. But I conclude that § 4.F did not prevent NIPSCO from cutting its monthly orders if it should turn out, as the year progressed, that the burn at Unit 15 made the annual estimate inaccurate.

Four smaller things conclude the case.

1. The annual estimate for 1984 (PX 7) contained substantially varying monthly takes, and NIPSCO in fact did not order "substantially equal amounts" that year. The 1984 estimate was the raw output of a PROMOD run showing what Schahfer 15 was likely to burn in each month. NIPSCO simply neglected to add the monthly totals and divide by 12. This was condoned, however. Ron Chesnos (the contract administrator at General Coal) noticed the deviations as soon as the 1984 estimate came in (DX HV) and asked for Seglem's opinion. Seglem fired back a memo (PX 32) stating that CWI should not ask for equal monthly

takes that year. Seglem testified (Tr. 1819) that he did so because CWI's opportunities to sell coal in the spot market would be most inviting during the months when NIPSCO wanted the smallest deliveries. Having welcomed the opportunity to make unequal deliveries in 1984, CWI is hardly in a position to cry foul. So far as I can tell, NIPSCO would have been willing to smooth out the pattern of its purchases had Seglem asked.

2. NIPSCO originally ordered 60,000 tons for December 1983. It later sent a letter raising the order to 100,000 tons (PX 5, p. 13). A few days later someone at NIPSCO called Seglem and reverted to the original 60,000. The monthly order letters are unquestionably binding, so CWI wants damages for the missing 40,000 tons. The problem is that in a requirements contract there are no "missing" tons. CWI supplies what Unit 15 burns. Over the long haul, these two are identical. That CWI supplied 40,000 tons less in December 1983 just means that it supplied 40,000 tons more in some later month. True, the time value of money is involved here; CWI got paid for these 40,000 tons a little later than it would otherwise have been; on the other hand, the order of 100,000 tons was an irregularly high order that itself violated the equal-monthly-tonnage rule of § 4.F, so perhaps CWI was better off delivering the coal more slowly. It is unduly speculative and therefore pointless to try to compute damages for the deferred delivery of these 40,000 tons.

3. Section 8.G of the Contract requires NIPSCO to recompense CWI for payments CWI must make to the federal government for coal leases. There was a parallel provision in the 1977 contracts. The course of performance was that CWI computed the lease payments it would make over the life of the lease, divided by the number of tons of coal, and got a price per ton. It billed NIPSCO that price per ton with each shipment of coal.

In April 1984 CWI signed a new lease with the federal government, substantially increasing its reserves. Although NIPSCO was paying for lease payments on the ex-

isting lease, CWI asked NIPSCO in September 1984 to increase its "Base Mine Price" to cover the new lease costs as well. NIPSCO declined. CWI did not attempt to bill NIPSCO for any lease payments allocable to tons actually mined from the new leasehold. Eventually, however, it sent NIPSCO a substantial bill for lease payments plus interest. (CWI borrowed the money to pay the federal government, and tried to collect the interest on that debt from NIPSCO.) Kelly rejected these bills. CWI next sent a single bill for the entire amount it had paid the government in 1984 and 1985 for the reserves, which are about four times the amount that CWI had committed to NIPSCO over the duration of this contract. Kelly rejected that bill too.

One can hardly blame Kelly for rebuffing these demands for payment. CWI cannot collect from NIPSCO the cost of the whole coal seam. And although interest is a real economic cost—one CWI incurs whether it borrows the money or not, so long as it pays the landlord before digging up the coal—the course of conduct under the 1977 contracts precludes the collection of the time value of money. NIPSCO was entitled to assume that CWI would bear the time value under the new Contract. CWI was free to negotiate for a change in the language but did not; NIPSCO was entitled to assume that the existing practice, under which it bore the principal and CWI the interest (time value of money) on lease payments that had to be made in advance, would continue.

4. Last and least, there is a small dispute about whether NIPSCO has burned CWI's coal exclusively to fulfill its requirements at Unit 15. A rider to the Contract (PX 2) allows NIPSCO to mix some of the Medicine Bow coal in the Unit 15 stockpile with CWI's coal, but to use no more than 5% Medicine Bow coal unless Unit 15 burns in any year more than the amount given in Exhibit I—in which event NIPSCO may satisfy the whole excess from the stockpile (if environmental considerations permit). NIPSCO in fact transferred most of the Medicine Bow coal to Mitchell Station and burned it there. It never burned more than 5% Medicine Bow coal at Unit 15 after signing the Contract.

■ NIPSCO briefly burned some Carbon County coal (about 5,000 tons) at Unit 15 as a result of a mixup in rail deliveries; it also burned some CWI coal at Unit 14 as a result of the same mixup. NIPSCO quickly recognized the problem when both Units started having trouble (slagging of the boilers at one and emissions problems at the other). This brief episode, the result of an honest (and unfortunate) error, is not a breach of the Contract.

### IV

NIPSCO filed a declaratory judgment action, and it is entitled to the following declaratory judgment:

> The contract of April 13, 1983, between Colorado Westmoreland, Inc., and Northern Indiana Public Service Co. remains in effect. NIPSCO is entitled to determine its requirements under the contract by dispatching Schahfer Unit 15 on strictly economic criteria. CWI is obligated to supply all of Unit 15's requirements for the duration of the Contract, so long as NIPSCO continues to dispatch Schahfer 15 on strictly economic criteria.

The clerk will enter this declaratory judgment as a separate document under Fed.R. Civ.P. 58.

On CWI's counterclaim for breach, promissory estoppel, and fraud, judgment shall go for NIPSCO, and CWI shall take nothing by its suit. The counterclaim will be dismissed with prejudice.