# FORT WAYNE CORRUGATED PAPER CO. v. ANCHOR HOCKING GLASS CORPORATION.

### No. 7976.

Circuit Court of Appeals, Third Circuit.

Argued July 10, 1942.

Decided Aug. 28, 1942.

See also, D.C., 31 F.Supp. 403; D.C., 1 F.R.D. 647.

Charles F. C. Arensberg, of Pittsburgh, Pa. (James M. Barrett, Jr., and Ella Graubart, both of Pittsburgh, Pa., on the brief), for appellant.

Elder W. Marshall, of Pittsburgh, Pa. (John C. Bane, Jr., and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., on the brief), for appellees.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This appeal is from a judgment of the District Court for the Western District of Pennsylvania in an action brought for an alleged breach of contract. Plaintiff is a manufacturer of corrugated paper boxes. It is the seller in the transaction out of which this law suit arises. Its dealings were had with a corporation known as Capstan Glass Company, the buyer. The intercorporate relationships between Capstan, Anchor Hocking Glass Corporation and others are irrelevant to the discussion of this point since it is settled by stipulation that whatever liability may rest upon Capstan was assumed by Anchor Hocking Glass Corporation.

Capstan in 1921 was engaged, at Connellsville, Pennsylvania, in the manufacture of glass containers for food and beverage companies. It shipped these containers to its customers in paper cartons. In that year Capstan, as buyer, entered into a written contract with Fort Wayne, as seller, in which it was agreed that the buyer would buy not less than 90% of its entire needs of corrugated paper and solid fiber products from Fort Wayne as seller. The buyer's needs were estimated not to exceed 500 carloads per year. The seller agreed to reserve production space for the manufacture of the buyer's requirements and not to make contracts for more than 50% of its production capacity. The contract was to continue for five years and thereafter until written notice of annulment was given by either party. There was a provision for termination a year after the notice of annulment was received during which period the seller could supply during the last three quarters of that year three-quarters, one-half and one-quarter what had been purchased during the ninety days prior to the notice of annulment.

During the years following the making of this contract the amount of purchases by the buyer increased from year to year. In 1930 the contract was amended, the amendments also incorporating supplementary agreements which had been made during the years since 1921. Under the new contract, the proportion of its requirements which Capstan agreed to buy from Fort Wayne was to be not less than 75% of its needs and these needs were estimated not to exceed 800 carloads a year. The provision for quantities to be bought and sold following notice of annulment was made automatic, and not optional, for either of the parties.

In 1930 also the parties entered into an agreement whereby Capstan agreed to erect a building on its land to be leased to Fort Wayne which would install the necessary machinery and equipment for making the paper containers. The building was erected by Capstan and leased to Fort Wayne. In 1937 the demand for paper boxes having increased it was agreed that Capstan should enlarge the building. Fort Wayne advanced the money for this purpose and the terms were agreed upon for the amortization of the advance. The judgment of the court below gave recovery to Fort Wayne for the unamortized portion of this advance and no question of recovery of this amount is before us on appeal.

The parties did business under this arrangement satisfactorily up to the latter part of 1937. During the last few months of that year there was a sudden recession of business so that the demand for glass containers fell off sharply and from the combination of this and labor trouble at the Capstan plant there was a marked reduction in the business done there at the close of that year. In October of this year Anchor Cap Corporation, which owned all of the Capstan stock, purchased the assets of the Hocking Glass Company and the consolidated business became the Anchor Hocking Glass Corporation. During the close of 1937 and the opening months of 1938 production of glassware at the Capstan plant remained at a low level. It is found as a fact that the president and general manager concluded that Capstan could not hope for any substantial increase of business within a reasonably brief period of time. In May, 1938, it was directed by resolution that operations at the plant should be suspended

on June 1, 1938. This direction was put into effect that month. Notice of annulment of the contract was not given to Fort Wayne until July 31, 1939, after the beginning of this law suit.

The learned trial Judge found for the defendants except as to the unamortized portion of the money advanced to build the addition to the building in Connellsville. And the plaintiff, Fort Wayne Company, brings the case on appeal to this Court. The plaintiff's argument is to the effect that Capstan and its successors, as buyers of the plaintiff's product, were required under the contracts with it to continue in normal operation of the plant at Connellsville until notice of annulment was given, as provided for, and thereafter defendants were required to take the diminishing amounts provided for in the annulment clause of the contract. Defendants contend that they are under no liability, that the contract was a requirements contract and having ceased having any requirements for plaintiff's paper boxes, they were under no obligation to take and pay for any of them.

This case is in a federal court because of diversity of citizenship. All the transactions seem to have occurred in Pennsylvania. The first contract was made here; while we do not find it expressly shown that the subsequent modifications relevant here were also made in Pennsylvania, we find nothing to the contrary. Certainly the business under the contract was all done in Pennsylvania. This is a case, therefore, where the Pennsylvania rule controls under the well known decision of Erie R. R. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, and the subsequent line of cases following that decision. The learned trial Judge so treated it and the parties so agreed at the trial. The appellant's position is that there is no Pennsylvania decision which is conclusive and the decision of this court in Diamond Alkali Co. v. P. C. Tomson & Co., Inc., 3 Cir., 1929, 35 F.2d 117, is decisive in controlling authority in this Circuit. But that case was decided when federal courts settled questions of general commercial law according to their own precedents and independent views upon the subject involved. That course is no longer open in such a case as this. Here we take the State law as the State courts have declared it without speculating upon the question whether, as an original proposition, we should reach the same conclusion or not.

Oler v. Lester Harding, Inc., 3 Cir., 1942, 127 F.2d 963.

We think that the three Pennsylvania decisions relied upon by the court below and discussed by the parties in this Court settle the question. Two of them were requirements contract cases and in one the sellers were to supply the buyers' requirements for coal during a given period. The buyers shifted to the use of gas and so required little or no coal. The court held there was no liability on the part of the buyers to the sellers. McKeever, Cook & Co. v. Canonsburg Iron Co., 1888, 1890, 138 Pa. 184, 16 A. 97, 20 A. 938. In another, plaintiff, as seller, had under a contract for State printing, the right for a specified time to print hunters' license tags. The buyer discontinued the use of printed tags and substituted aluminum plates. The court held that the seller had no cause of action against the buyer. Kuhn v. Commonwealth, 1928, 291 Pa. 497, 140 A. 527.

The converse situation to the requirements contract is the output contract. In Sheesley v. Bisbee Linseed Co., 1940, 337 Pa. 197, 10 A.2d 401, the plaintiff had an exclusive contract with the defendant for a particular brand of the latter's oil meal, for a specified territory during a given time. An increase in import duty upon the seed from which the oil was made caused the seller to discontinue the manufacture of the product. The court held that the buyer had no rights against the seller. It seems to us a fair statement from these cases that under the Pennsylvania decisions the buyer in a requirements contract has no duty to have any requirements and a seller under an output contract has no duty to have any output. It may be assumed that good faith is required and that a party under contract cannot pretend not to have a requirement to avoid his obligation under the contract. See the McKeever case, supra, opinion on second appeal, and the Sheesley case, supra. But the good faith point is settled in this case by the findings of fact made by the trial Judge which are not attacked by the appellant. The court expressly found that the shutdown of the Capstan plant at Connellsville was decided upon by the Board of Directors for what it believed to be valid business reasons and in good faith. It also found that in the decision to close the plant neither the company nor its manager was moved by any purpose to avoid any obligation of Capstan to Fort Wayne or to divert

the business of the Connellsville plant to other plants controlled by the parent corporation.

In view of the Pennsylvania decisions as to the law and the express findings of fact by the trial Judge we see no other possible conclusion than that the case was correctly decided.

The judgment of the District Court is affirmed.