**EMPIRE GAS CORPORATION,**
Plaintiff–Appellee,

v.

**AMERICAN BAKERIES COMPANY,**
Defendant–Appellant.

No. 87–1411.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 13, 1987.

Decided Feb. 16, 1988.

Petition for Rehearing Dismissed
May 12, 1988.

Bernard J. Nussbaum, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendant-appellant.

Thomas H. Davis, Morris, Larson, King & Stamper, Kansas City, Mo., for plaintiff-appellee.

Before POSNER, FLAUM and KANNE, Circuit Judges.

POSNER, Circuit Judge.

This appeal in a diversity contract case presents a fundamental question—surprisingly little discussed by either courts or commentators—in the law of requirements contracts. Is such a contract essentially a buyer's option, entitling him to purchase all he needs of the good in question on the terms set forth in the contract, but leaving him free to purchase none if he wishes

provided that he does not purchase the good from anyone else and is not acting out of ill will toward the seller?

Empire Gas Corporation is a retail distributor of liquefied petroleum gas, better known as "propane." It also sells converters that enable gasoline-powered motor vehicles to operate on propane. The sharp rise in gasoline prices in 1979 and 1980 made American Bakeries Company, which operated a fleet of more than 3,000 motor vehicles to serve its processing plants and bakeries, interested in the possibility of converting its fleet to propane, which was now one-third to one-half less expensive than gasoline. Discussions between the companies resulted in an agreement in principle. Empire Gas sent American Bakeries a draft of its standard "Guaranteed Fuel Supply Contract," which would have required American Bakeries to install a minimum number of conversion units each month and to buy all the propane for the converted vehicles from Empire Gas for eight years. American Bakeries rejected the contract and Empire Gas prepared a new one, which was executed on April 17, 1980, and which was "for approximately three thousand (3,000) [conversion] units, more or less depending upon requirements of Buyer, consisting of Fuel Tank, Fuel Lock Off Switch, Converter & appropriate Carburetor & Small Parts Kit," at a price of $750 per unit. American Bakeries agreed "to purchase propane motor fuel solely from EMPIRE GAS CORPORATION at all locations where EMPIRE GAS has supplied carburetion and dispensing equipment as long as EMPIRE GAS CORPORATION remains in a reasonably competitive price posture with other major suppliers." The contract was to last for four years.

American Bakeries never ordered any equipment or propane from Empire Gas. Apparently within days after the signing of the contract American Bakeries decided not to convert its fleet to propane. No reason has been given for the decision.

Empire Gas brought suit against American Bakeries for breach of contract and won a jury verdict for $3,254,963, repre-senting lost profits on 2,242 conversion units (the jury's estimate of American Bakeries' requirements) and on the propane fuel that the converted vehicles would have consumed during the contract period. The judge added $581,916 in prejudgment interest.

■ American Bakeries' first argument is that it was entitled to a directed verdict because the evidence showed that Empire Gas could not possibly have tendered conforming goods. Shortly before signing the contract with American Bakeries, Empire Gas had signed a contract to buy a Dutch-made conversion unit, the Bé & Bé, and it brought samples of the unit to its negotiating sessions with American Bakeries and gave American Bakeries literature describing the unit. This was the only unit the parties discussed. It was a flop, and eventually Empire Gas asked the U.S. Customs Service to reclassify it as either waste or scrap. American Bakeries argues that the contract it signed with Empire Gas was a contract to purchase the Bé & Bé unit, and hence that Empire Gas could not have supplied conforming goods even if American Bakeries had carried out its alleged contractual commitments in full.

American Bakeries relies on sections 2–313(1)(b) and (c) of the Uniform Commercial Code (adopted in Illinois—whose law, the parties agree, governs the substantive issues in this case—as Ill.Rev.Stat. ch. 26, ¶¶ 2–313(1)(b), (c)). The former provides that "any description of the goods *which is made part of the basis of the bargain* creates an express warranty that the goods shall conform to the description," the latter that "any sample or model *which is made part of the basis of the bargain* creates an express warranty that the whole of the goods shall conform to the sample or model." As the clause (identical in both provisions) that we have italicized suggests—though none too clearly, as White & Summers, Handbook of the Law Under the Uniform Commercial Code 332–35 (2d ed. 1980), points out—the description or sample creates an obligation of conforming tender only if the parties intended to contract with reference to the specific description or sam-

ple. It thus is necessary to determine whether the Bé & Bé was the thing the parties intended to contract for or was merely descriptive, illustrative, or suggestive. See UCC § 2–313, comment 6; Hawkland UCC Series § 2–313:06 (Art. 2–p. 304) (1987). Ordinarily, and here, which it was is a jury question. See *Alan Wood Steel Co. v. Capital Equipment Enterprises, Inc.*, 39 Ill.App.3d 48, 56–57, 349 N.E.2d 627, 632–33 (1976).

The contract does not mention the Bé & Bé unit, as American Bakeries could have demanded that it do; and as the contract contains a standard parol-evidence clause ("This Agreement comprises the entire Agreement, and there are no agreements, understandings, conditions, warranties or representation[s], oral or written, express or implied, concerning the subject matter or in consideration hereof which are not merged herein"), the discussions between the parties concerning the Bé & Bé unit cannot be used to alter the meaning of the contract. Anyway it is unlikely that American Bakeries cared what the brand was. What did it know about conversion units? Empire Gas was the expert on propane technology; all American Bakeries would have cared about was that Empire Gas supply a unit that worked. Empire Gas thought at the time that this would be the Bé & Bé unit, but it later changed its mind. Empire Gas does not manufacture conversion equipment, but supplies it essentially as an accommodation to the customers for its propane, the major part of its business. (The lion's share of the damages awarded by the jury was for lost profits on the sale of propane.) It would have been ridiculous for Empire Gas to sacrifice the contract's major objective by supplying unusable conversion equipment; no conversion, no sales of propane. Knowing this, American Bakeries presumably was content to let Empire Gas decide what conversion unit to supply. So at least a reasonable jury could conclude. It could also conclude that Empire Gas, which had an extensive inventory of conversion equipment manufactured by different companies, could and would have found satisfactory equipment to supply American Bakeries.

The heart of this case is the instruction concerning American Bakeries' obligation under the contract. If there were no legal category of "requirements" contracts and no provision of the Uniform Commercial Code governing such contracts, a strong argument could be made that American Bakeries agreed to buy 3,000 conversion units or *slightly* more or *slightly* less, depending on its actual needs, and hence that it broke the contract by taking none. This is not only a semantically permissible reading of the contract but one supported by the discussions that the parties had before the contract was signed (and these discussions are admissible to explain though not to change the parties' undertakings), in which American Bakeries assured Empire Gas that it was planning to convert its entire fleet. American Bakeries insisted on adding the phrase "more or less depending upon requirements of Buyer" just in case its estimate of 3,000 was off, and this is quite different from supposing that the phrase was added so that American Bakeries would have no obligation to buy any units at all.

The parties agree, however, that despite the negotiating history and the inclusion in the contract of a specific estimate of quantity, the quoted phrase sorted the contract into the legal bin labeled "requirements contract" and thereby brought it under the governance of section 2–306(1) of the Uniform Commercial Code, which provides:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

Over American Bakeries' objection the judge decided to read the statute to the jury verbatim and without amplification, remarking to the lawyers,

> Now, I have nothing to do with the fact that there may be some ambiguity in 2–306. If there is ambiguity, well, that

is too bad. This is the law that the legislature has adopted. With due respect to all these great judges that [American Bakeries' counsel] has cited and these great academic lawyers he has called to my attention, well, good, they have a lot of time to mull over these problems.

But I have the problem of telling this jury what the law is, and the law is right here, right here in this statute, and I have a good deal of faith in this jury's ability to apply this statute to the facts of this case.

It is not true that the law is what a jury might make out of statutory language. The law is the statute as interpreted. The duty of interpretation is the judge's. Having interpreted the statute he must then convey the statute's meaning, as interpreted, in words the jury can understand. If section 2–306 means something different from what it seems to say, the instruction was erroneous.

The interpretive question involves the proviso dealing with "quantity unreasonably disproportionate to any stated estimate." This limitation is fairly easy to understand when the disproportion takes the form of the buyer's demanding more than the amount estimated. If there were no ceiling, and if the price happened to be advantageous to the buyer, he might increase his "requirements" so that he could resell the good at a profit. See, e.g., *Crane v. C. Crane & Co.*, 105 Fed. 869, 872 (7th Cir.1901); Weistart, *Requirements and Output Contracts: Quantity Variations Under the UCC*, 1973 Duke L.J. 599, 640–41; cf. *Utah International, Inc. v. Colorado–Ute Electric Ass'n, Inc.*, 425 F.Supp. 1093, 1100–01 (D.Colo.1976). This would place him in competition with the seller—a result the parties would not have wanted when they signed the contract. So the "unreasonably disproportionate" proviso carries out the likely intent of the parties. The only problem is that the same result could easily be reached by interpretation of the words "good faith" in the preceding clause of section 2–306(1), thus making the proviso redundant. But redundancies designed to clarify or emphasize

are common in legal drafting; and anyway the Uniform Commercial Code has its share of ambiguities, see *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1288 (7th Cir.1986).

The proviso does not distinguish between the buyer who demands more than the stated estimate and the buyer who demands less, and therefore if read literally it would forbid a buyer to take (much) less than the stated estimate. Since the judge did not attempt to interpret the statute, the jury may have read it literally, and if so the judge in effect directed a verdict for Empire Gas. The stated estimate was for 3,000 units; American Bakeries took none; if this was not unreasonably disproportionate to the stated estimate, what buyer shortfall could be?

■ So we must decide whether the proviso should be read literally when the buyer is demanding less rather than more than the stated estimate. There are no cases on the question in Illinois, and authority elsewhere is sparse, considering how often (one might think) the question must have arisen. But the clearly dominant approach is not to construe the proviso literally, but instead to treat the overdemanding and underdemanding cases differently. See, e.g., *Angelica Uniform Group, Inc. v. Ponderosa Systems, Inc.*, 636 F.2d 232 (8th Cir. 1980) (per curiam) (Missouri law); *R.A. Weaver & Associates, Inc. v. Asphalt Construction, Inc.*, 587 F.2d 1315, 1322 (D.C. Cir.1978) (District of Columbia law); *Lambert Corp. v. Evans*, 575 F.2d 132, 138 (7th Cir.1978) (Wisconsin law); *HML Corp. v. General Foods Corp.*, 365 F.2d 77, 81 n. 5 (3d Cir.1966) (dictum) (New York law); *Northern Indiana Public Service Co. v. Colorado Westmoreland, Inc.*, 667 F.Supp. 613, 636 (N.D.Ind.1987) (Indiana law); Note, *Requirements Contracts, "More or Less," Under the Uniform Commercial Code*, 33 Rutgers L.Rev. 105, 120–21 (1980); Note, *Requirements Contracts: Problems of Drafting and Construction*, 78 Harv.L.Rev. 1212, 1220 (1965). We think this is right. We also note that it was the common law approach: "the seller assumes the risk of all good faith varia-

tions in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business." *HML Corp. v. General Foods Corp., supra,* 365 F.2d at 81; see also *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.,* 130 F.2d 471, 473 (3d Cir.1942).

Granted, there is language in the Official Comments (not official in Illinois, be it noted) which points to symmetrical treatment of the overdemanding and underdemanding cases: "the agreed estimate is to be regarded as a center around which the parties intend the variation to occur." UCC § 2–306, comment 3. But there is no elaboration; and the statement is in tension with the statement in comment 2 that "good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance," for if that principle is sound in general, why should it cease to be sound just because the parties included an estimate of the buyer's requirements? A tiny verbal point against the symmetrical interpretation is the last word of the proviso—"demanded." The statement that "no quantity unreasonably disproportionate to any stated estimate ... may be ... demanded" is more naturally read as applying to the case where the buyer is demanding more than when he is reducing his demand below the usual or estimated level.

■ More important than this verbal skirmishing is the fact that the entire proviso is in a sense redundant given the words "good faith" in the main clause of the statute. The proviso thus seems to have been designed to explicate the term "good faith" rather than to establish an independent legal standard. And the aspect of good faith that required explication had only to do with disproportionately *large* demands. If the buyer saw an opportunity to increase his profits by reselling the seller's goods because the market price had risen above the contract price, the exploitation of that opportunity might not *clearly* spell bad faith; the proviso was added to close off the opportunity. There is no indication that the draftsmen were equally, if at all, concerned about the case where the

buyer takes less than his estimated requirements, provided, of course, that he does not buy from anyone else. We conclude that the Illinois courts would allow a buyer to reduce his requirements to zero if he was acting in good faith, even though the contract contained an estimate of those requirements.

This conclusion would be greatly strengthened—too much so, as we shall see—if the only purpose of a requirements contract were to give the seller a reasonably assured market for his product *by forbidding the buyer to satisfy any of his needs by buying from another supplier.* (An output contract, also dealt with in section 2–306(1), gives the buyer a reasonably assured source of supply by forbidding the seller to sell any of his output to any other buyer.) The buyer's undertaking to deal exclusively with a particular seller gives the seller some, although far from complete, assurance of having a market for his goods; and of course he must compensate the buyer for giving up the opportunity to shop around for a better deal from competing sellers.

There was no breach of *this* obligation, or, at most, a trivial one. (American Bakeries did convert 229 of its vehicles to propane, using equipment bought from another company; but the record is silent on how many, if any, of these purchases occurred while the contract with Empire Gas was in force.) If the obligation were not just to refrain from buying a competitor's goods but to buy approximately the stated estimate (or, in the absence of any estimate, the buyer's "normal" requirements), the contract would be altogether more burdensome to the buyer. Instead of just committing himself not to buy from a competitor even if the competitor offered a better product or terms of sale, he would be committing himself to go through with whatever project generated the estimate of required quantity, no matter what happened over the life of the project save those exceptional events that would excuse performance under the related excuses of *force majeure,* impossibility, impracticability, or frustration. This would be a big commitment to infer from the inclusion in

the contract of an estimated quantity, at least once the parties concede as they do here that their contract really is a requirements contract and not a contract for the estimate itself—not, in other words, a fixed-quantity contract.

Both extreme interpretations—that the buyer need only refrain from dealing with a competitor of the seller, and that the buyer cannot go significantly beneath the estimated quantity except in dire circumstances—must be rejected, as we shall see. Nevertheless the judge should not have read the "unreasonably disproportionate" proviso in section 2–306(1) to the jury. The proviso does not apply, though the requirement of good faith does, where the buyer takes less rather than more of the stated estimate in a requirements contract.

This error in instructions requires reversal and a new trial on liability unless it is clear either that American Bakeries acted in good faith or that it acted in bad faith, since the statute requires the buyer to take his "good faith" requirements from the seller, irrespective of proportionality. The Uniform Commercial Code does not contain a definition of "good faith" that seems applicable to the buyer under a requirements contract. Compare section 2–104(1) with section 2–103(1)(b). Nor has the term a settled meaning in law generally; it is a chameleon. See, e.g., *Bosco v. Serhant*, 836 F.2d 271, 278 (7th Cir.1987); *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir.1985). Clearly, American Bakeries was acting in bad faith if during the contract period it bought propane conversion units from anyone other than Empire Gas, or made its own units, or reduced its purchases because it wanted to hurt Empire Gas (for example because they were competitors in some other market). Equally clearly, it was not acting in bad faith if it had a business reason for deciding not to convert that was independent of the terms of the contract or any other aspect of its relationship with Empire Gas, such as a drop in the demand for its bakery products that led it to reduce or abandon its fleet of delivery trucks. A harder question is whether it was acting in bad faith if it changed its mind about conversion for no (disclosed)

reason. There is no evidence in the record on why it changed its mind beyond vague references to "budget problems" that, so far as appears, may have been nothing more than a euphemism for a decision by American Bakeries not to allocate funds for conversion to propane.

If no reason at all need be given for scaling back one's requirements even to zero, then a requirements contract is from the buyer's standpoint just an option to purchase up to (or slightly beyond, i.e., within the limits of reasonable proportionality) the stated estimate on the terms specified in the contract, except that the buyer cannot refuse to exercise the option because someone offers him better terms. This is not an unreasonable position, but it is not the law. Among the less important reasons for this conclusion are that option contracts are dealt with elsewhere in the Code, see section 2–311, and that the Official Comments to section 306 state that "a shut-down by a requirements buyer for lack of orders might be permissible where a shut-down *merely to curtail losses* would not." UCC § 2–306, comment 2 (emphasis added). More compelling is the Illinois Code Comment to section 2–306, which states that "this section ... is but a codification of prior Illinois decisional law," which had made clear that a requirements contract was more than a buyer's option. "By the original agreement, appellant was entitled to order all the coal which was required or needed in its business for the season named; by the modified contract, appellant was restricted to the privilege of ordering twelve thousand tons. It was not the intention here to contract for the mere option or privilege of buying coal at a future time, but simply to limit the quantity to be bought.... [I]t was not intended to be an option contract." *Minnesota Lumber Co. v. Whitebreast Coal Co.*, 160 Ill. 85, 96–97, 43 N.E. 774 (1896). "Requirements" are more than purely subjective "needs," which would be the equivalent of "wants." See *National Furnace Co. v. Keystone Mfg. Co.*, 110 Ill. 427, 433–34 (1884). *Chalmers & Williams v. Bledsoe & Co.*, 218 Ill.App. 363 (1920), held that a

buyer's decision to switch from coal to electricity did not excuse it from its obligation to purchase its "consumption requirements" of coal from the seller. That was a stronger case for the buyer than the present one, because the buyer did make a fundamental change in its operations—yet this did not excuse it, when it gave no reason for the change. See also *Loudenback Fertilizer Co. v. Tennessee Phosphate Co.*, 121 Fed. 298, 303 (6th Cir.1903).

These cases are old, but nothing has happened to sap their strength, and *National Furnace* has been cited and followed in a modern case. See *Illinois Commerce Comm'n v. Central Illinois Public Service Co.*, 25 Ill.App.3d 79, 82, 322 N.E. 2d 520, 523 (1975). The statement of an estimate invites the seller to begin making preparations to satisfy the contract, and although no reliance expense was incurred by the seller in this case, a seller is entitled to expect that the buyer will buy something like the estimated requirements unless it has a valid business reason for buying less. More important than the estimate (which was not a factor in the Illinois cases just cited) is the fact that ordinarily a requirements contract is terminated after performance has begun, rather than before as in the present case. Whether or not the seller can prove reliance damages, the sudden termination of the contract midway through performance is bound to disrupt his operations somewhat. The Illinois courts interpret a requirements contract as a sharing of risk between seller and buyer. The seller assumes the risk of a change in the buyer's business that makes continuation of the contract unduly costly, but the buyer assumes the risk of a less urgent change in his circumstances, perhaps illustrated by the facts of this case where so far as one can tell the buyer's change of mind reflected no more than a reassessment of the balance of advantages and disadvantages under the contract. American Bakeries did not agree to buy conversion units and propane for trucks that it got rid of, but neither did Empire Gas agree to forgo sales merely because new management at American Bakeries decided that its capital would be better employed in some other investment than conversion to propane.

The general distinction that we are trying to make is well illustrated by *Southwest Natural Gas Co. v. Oklahoma Portland Cement Co.*, 102 F.2d 630 (10th Cir. 1939), which to the drafters of the Uniform Commercial Code exemplified "reasonable variation of an extreme sort" (at least in the absence of an estimate, but that is irrelevant, for reasons we have explained). UCC § 2–306, comment 2. A cement company agreed to buy all of its requirements of gas from the seller for 15 years. Seven years later, the cement company replaced its boiler, which had worn out, with more modern equipment; as a result its need for gas fell by 80 percent. The court deemed this a bona fide change in the cement company's requirements. It would have been unreasonable to make the company replace its worn-out plant with an obsolete facility.

It is a nice question how exigent the buyer's change of circumstances must be to allow him to scale down his requirements from either the estimated level or, in the absence of estimate, the "normal" level. Obviously it need not be so great as to give him a defense under the doctrines of impossibility, impracticability, or frustration, or under a *force majeure* clause. Yet, although more than whim is required, see *Tennessee Valley Authority v. Imperial Professional Coatings*, 599 F.Supp. 436, 439 (E.D.Tenn.1984), how much more is unclear. There is remarkably little authority on the question. This is a good sign; it suggests that, while we might think it unsatisfactory for the law to be unclear on so fundamental a question, the people affected by the law are able to live with the lack of certainty. The reason may be that parties linked in an ongoing relationship—the usual situation under a requirements contract—have a strong incentive to work out disagreements amicably rather than see the relationship destroyed by litigation.

The essential ingredient of good faith in the case of the buyer's reducing his estimated requirements is that he not merely have had second thoughts about the terms of the contract and want to get out

of it. See *Wilsonville Concrete Products v. Todd Building Co.*, 281 Or. 345, 352, 574 P.2d 1112, 1115 (1978); *Royal Paper Box Co. v. E.R. Apt Shoe Co.*, 290 Mass. 207, 195 N.E. 96 (1935); *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp., supra*, 130 F.2d at 473–74; White & Summers, *supra*, at 126. Whether the buyer has any greater obligation is unclear, see *id.* at 126–27, but need not be decided here. Once it is decided (as we have) that a buyer cannot arbitrarily declare his requirements to be zero, this becomes an easy case, because American Bakeries has never given any reason for its change of heart. It might seem that once the district judge decided to instruct the jury in the language of the statute, American Bakeries was foreclosed from arguing that it had scaled down its requirements in good faith; a reduction to zero could never be proportionate if, as the instruction implied, the proviso on disproportion applies to reductions as well as increases in the buyer's takings. But the judge did not make this decision until the instructions conference. Until then American Bakeries had every opportunity and incentive to introduce evidence of why it decided not to convert its fleet to propane. It introduced none, and even at the argument in this court its counsel could give no reason for the change of heart beyond a hint that it was due to a change in management, which would not be enough by itself to justify a change in the buyer's requirements.

■ Even though Empire Gas had the burden of proving breach of contract and therefore (we may assume) of proving that American Bakeries acted in bad faith in reducing its requirements from 3,000 conversion units to zero (see *HML Corp. v. General Foods Corp., supra*, 365 F.2d at 83; but see *Utah International, Inc. v. Colorado–Ute Electrical Ass'n, Inc., supra*, 425 F.Supp. at 1100), no reasonable jury could have failed to find bad faith, and therefore the error in instructing the jury on proportionality was harmless. Empire Gas put in evidence, uncontested and incontestable, showing that American Bakeries had not got rid of its fleet of trucks and did have the financial wherewithal to go through with the conversion process. After this evidence came in, American Bakeries could avoid a directed verdict only by introducing some evidence concerning its reasons for reducing its requirements. It not only introduced no evidence, but as is plain from counsel's remarks at argument it has no evidence that it would care to put before the jury—no reasons that it would care to share with either the district court or this court. It disagrees with the standard of good faith, believing that so long as it did not buy conversion units elsewhere or want to hurt Empire Gas it was free to reduce its requirements as much as it pleased. It does not suggest that it has a case under the standard we have adopted, which requires at a minimum that the reduction of requirements not have been motivated solely by a reassessment of the balance of advantages and disadvantages under the contract to the buyer.

■ Next, American Bakeries argues that it is entitled to a new trial because of the judge's refusal to allow the introduction of evidence that Empire Gas had in pretrial discovery willfully failed to provide documents that revealed its belief that the Bé & Bé units were junk. The judge thought the probative value of this evidence substantially outweighed by its probable prejudicial effect on the jury, see Fed. R.Evid. 403—and he was right, if only because the evidence was at best cumulative and probably irrelevant. There was no question the Bé & Bé unit was junk; the only question was whether the contract would have entitled American Bakeries to refuse to accept a substitute unit, a question to which the documents in question are barely if at all relevant and to which the answer in any event seems clearly no.

■ The jury's finding of liability must stand; but was there error in the assessment of damages? American Bakeries objects violently to the assumption made by Empire Gas's expert witness that the vehicles converted by American Bakeries, had it honored what Empire Gas contends were its obligations under the contract, would have run 100 percent on propane. The

conversion units would have been dual units, which permit the driver by a flick of a switch in the engine to run his vehicle on either gasoline or propane. But since the parties agree that the price of propane was lower than that of gasoline throughout the entire contract period, a driver would have switched his conversion unit to gasoline only when he was low on propane and too far away from a propane station to reach it before he ran out. This factor was not big enough to upset the expert witness's calculations significantly. The calculation of damages is estimation rather than measurement, and it is foolish to prolong a lawsuit in quest of delusive precision.

The other complaints about the damage assessment are equally inconsequential, and do not require discussion. A great weakness of American Bakeries' case was its failure to present its own estimate of damages, in the absence of which the jury could have no idea of what adjustments to make in order to take account of American Bakeries' arguments. American Bakeries may have feared that if it put in its own estimate of damages the jury would be irresistibly attracted to that figure as a compromise. But if so, American Bakeries gambled double or nothing, as it were; and we will not relieve it of the consequences of its risky strategy.

■ But we think the judge erred in awarding prejudgment interest. The Illinois statute allows such interest to be awarded at the rate of five percent "for all moneys after they become due on any ... instrument of writing." Ill.Rev.Stat. ch. 17, ¶ 6402. Traditionally, such statutes were narrowly construed, consistent with a long history of confining the award of prejudgment interest to cases where the extent of the contract breaker's liability was clear at the time of breach, so that he could have stopped the running of interest just by depositing the amount in court. In recent years the requirement that the damages be readily ascertainable at the time of

breach has been relaxed in line with the general trend toward giving winning plaintiffs something closer to full compensation for their injuries. See, e.g., *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370–71 (7th Cir.1985). But the trend has not reached the point of allowing prejudgment interest in a case like this. At the time of breach, and indeed right up to the jury's verdict, it was entirely unclear what Empire Gas's loss had been, since that depended not only on the precise extent of American Bakeries' requirements but on Empire Gas's profit margins on converting units and propane. See, e.g., *Cushman & Wakefield of Illinois, Inc. v. Northbrook 500 Limited Partnership*, 112 Ill.App.3d 951, 963, 68 Ill.Dec. 460, 468, 445 N.E.2d 1313, 1321 (1983).

The judgment is affirmed except for the award of prejudgment interest.

MODIFIED AND AFFIRMED.

KANNE, Circuit Judge, dissenting:

I agree with the majority that the error in giving the instruction regarding the "unreasonably disproportionate" proviso in Illinois' Uniform Commercial Code § 2–306(1) requires a reversal and new trial, "unless it is clear either that American Bakeries acted in good faith or that it acted in bad faith...." The fundamental problem is that there was no evidence of either good or bad faith as those terms are normally defined.[1] For different reasons neither Empire Gas nor American Bakeries produced evidence of American Bakeries' honesty or dishonesty or fair or unfair dealing in regard to its reduction of its requirements to zero.

As in *Massey–Ferguson, Inc. v. Helland*, 105 Ill.App.3d 648, 61 Ill.Dec. 142, 146, 434 N.E.2d 295, 299 (1982), "... the material testimony in this case did not reveal any lies, deceit, overreaching or other examples of dishonesty in fact in the transaction ... nor was any evidence adduced regarding reasonable commercial standards of fair

---

**1.** Section 1–201(19) which applies to all sections of the code defines good faith as "honesty in fact in the conduct or transaction concerned." Section 2–103, which applies to sales, defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

dealing in the trade." In *Massey–Ferguson*, the Illinois Appellate Court found that a plaintiff's failure to introduce specific evidence as to bad faith constituted a failure to carry its burden of proof on the issue of bad faith.

The majority in the case before us assumes that Empire Gas bears the burden of proof on the issue of American Bakeries' bad faith. The majority then presumes that Empire meets this burden of showing bad faith by simply presenting evidence that "American Bakeries had not got rid of its fleet of trucks and did have the financial wherewithal to go through with the conversion." I do not agree that from this scant evidence "no reasonable jury could have failed to find bad faith," and thus the district court's failure to instruct the jury properly on this issue was not harmless error. In reality, at trial, Empire Gas was never required to shoulder—let alone carry—any actual burden of proof on bad faith.[2] The majority thus transforms the seller's theoretical burden of proof on bad faith (unarticulated to the jury) into an actual presumption of the buyer's bad faith (articulated post-trial).

Empire Gas, if actually put to the test, may or may not be able to produce evidence of bad faith. Likewise, we do not know whether American Bakeries would be able to produce evidence to support a good faith reduction to zero. Absent the majority's presumption, at trial no one knew, at least based on the evidence, that it had become American Bakeries' burden to go forward with proof of its good faith.

Clearly American Bakeries' reduction of its requirements for conversion units from 3,000 to zero was "unreasonably disproportionate" on its face. However, the court (correctly I believe) holds today that what appears to be a buyers' unreasonably disproportionate reduction of requirements is not enough to determine liability under

§ 2–306—evidence of a buyer's good or bad faith is also necessary.

It is not this standard, but its practical application to the trial of this case, which causes me to part company with my brethren.

If, as the majority apparently holds—the seller has the burden of proof on the issue of the buyer's bad faith—I would reverse and remand for new trial because Empire Gas did not bear that burden and the trial record discloses no facts ordinarily found necessary by Illinois courts to prove bad faith.

If, on the other hand, the majority actually holds (again correctly I believe)—a buyer's assertion of an unreasonably disproportionate reduction in his requirements creates a bad faith presumption which may be rebutted by the buyer's proof of good faith—I would also reverse and remand for a new trial because this new rebuttable presumption of bad faith was not the Illinois rule under which the trial was conducted.

---

2. The district court actually rejected the instruction tendered by American Bakeries which articulated Empire's burden of proof regarding bad faith. American Bakeries' tendered Instruction No. 19 reads in pertinent part as follows:

. . . . .

The buyer must exercise good faith in determining its requirements. Good faith means honesty in fact in the conduct or transaction concerned.

Even if an estimate is stated in a requirements contract, the buyer need not order more goods than the buyer in good faith determines it requires. This is so even if such good faith requirements are substantially less than a previously stated estimate or even if the buyer has no requirements at all.

The seller has the burden of proving that the buyer has set its requirements in bad faith.