March 29, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1978

ATLANTIC TRACK & TURNOUT COMPANY,

Plaintiff, Appellant,

v.

PERINI CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Torruella, Circuit Judge,

Coffin, Senior Circuit Judge,

and Boudin, Circuit Judge.

David J. Hopwood, with whom Heafitz & Hopwood, was on brief

for appellant.
Charles E. Schaub, Jr., with whom Christopher J. Petrini,

and Hinckley, Allen & Snyder, were on brief for appellee.

March 29, 1993

TORRUELLA, Circuit Judge. Appellant Atlantic Track &

Turnout Company ("Atlantic") brought this breach of contract

action pursuant to the Uniform Commercial Code ("Code"), Mass.

Gen. L. ch. 106, 2-101, et seq. (1992). Atlantic alleged that

appellee Perini Corporation ("Perini") failed to perform under a

contract for the purchase and sale of railroad materials.

The court deferred decision on cross motions for

summary judgment and ordered a trial limited to two issues: (1)

whether the contract was ambiguous; and (2) whether trade usage

would supplement the contract terms to enable Atlantic to

maintain its action. After Atlantic's proffer, the court entered

a judgment on partial findings pursuant to Fed. R. Civ. P.

52(c)1 in favor of Perini. We affirm that judgment.

BACKGROUND

On October 21, 1987, the Massachusetts Bay

Transportation Authority ("MBTA") awarded Perini the Eastern

Route Track Rehabilitation Project. The project required Perini

to rehabilitate a thirteen mile section of double track. The

rehabilitation included undercutting the track to replace the

ballast, the track's stone foundation, and disposing of any

1 Rule 52(c) provides in relevant part:

If during a trial without a jury a party
has been fully heard with respect to an
issue and the court finds against the
party on that issue, the court may enter
judgment as a matter of law against that
party on any claim . . . that cannot
under controlling law be maintained or
defeated without a favorable finding on
that issue . . . .

-2-

contaminated ballast materials.

In the spring of 1988, a sub-contractor tested the

ballast under the track and determined that it was all

contaminated. Perini received the test results on June 21, 1988

and discussed them with the MBTA on July 17, 1988.

In early June, 1988, Perini solicited an offer from

Atlantic to buy certain salvage from the project. Between June

28 and 30, 1988, Atlantic issued five purchase orders for "all

available" materials. The orders also furnished an estimate of

the amount of salvage that would become available.

On August 18, 1988, the MBTA directed Perini to suspend

undercutting operations until further notice. On September 13,

1988, the MBTA permanently halted all undercutting due to fiscal

constraints. As the elimination of the undercutting reduced the

value of the contract by 52%, Perini stopped all work. By

October 26, Perini had no physical presence on the project site.

On October 31, 1988, Perini proposed an equitable

adjustment of the MBTA contract. The proposal entailed an

increase in payment for completion of the remaining work under

the contract. The MBTA rejected Perini's proposal. Perini and

the MBTA thus agreed to terminate the contract.

Atlantic knew by August 22, 1988 that all undercutting

was suspended and later asked Perini when the remainder of the

materials would be available. Perini replied that the MBTA might

terminate the project and that Perini had already shipped "all

-3-

available" salvage in accordance with the purchase orders.2

Atlantic sued Perini, claiming that the amount of materials

shipped was well below the stated estimates.

LEGAL ANALYSIS

Two reasonable interpretations of the contract's plain

language exist. On one hand, "all available" implies that Perini

satisfied its obligation under the contract by supplying the

salvage material that became available; if no material became

available to Perini, Perini faced no liability under the

contract.3 On the other hand, the estimates offered in the

purchase orders suggest that Perini had to deliver a quantity

nearing those estimates.

To convince the court that the latter interpretation

represented the true agreement, Atlantic had to overcome two

hurdles. First, as the plaintiff, Atlantic had the burden of

proving its interpretation by a preponderance of the evidence.

Second, any ambiguity in the contract should normally be

interpreted against Atlantic, the drafter of the purchase orders.

LFC Lessors, Inc. v. Pacific Sewer Maintenance, 739 F.2d 4, 7

(1st Cir. 1984).

Atlantic offered two theories beyond the plain language

of the contract supporting its interpretation of the terms.

Specifically, Atlantic argued that: (1) trade usage of the term

2 At this point, Perini had delivered approximately 15% of the
materials estimated.

3 Of course, the Code requires that Perini attempt to attain the
materials in good faith. Mass. Gen. L. ch. 106, 2-306.

-4-

"all available" required Perini to deliver close to the estimated

quantity of materials, and (2) 2-306 of the Code expressly

required Perini to provide a quantity approximating its stated

estimate. In addition, Atlantic argued that Perini acted in bad

faith. Atlantic revives these theories in this appeal, and we

address them in turn.

I. Trade Usage

The district court ruled that Atlantic's trade usage

proffer failed to prove by a preponderance of the evidence that

the contract terms embodied Atlantic's proposed meaning. As this

conclusion constitutes a factual finding, Mass. Gen. L. ch. 106,

1-205(2), we review it only for clear error, Athas v. United

States, 904 F.2d 79, 80 (1st Cir. 1990).

Trade usage will supplement the terms of a contract

only when the parties know or should know of that usage. Mass.

Gen. L. ch. 106, 1-205(3). In the present case, Atlantic

provided no evidence that Perini knew or should have known of

Atlantic's interpretation of the term "all available." There was

no evidence that Perini engaged in the same trade as Atlantic.

Indeed, one Atlantic witness testified that Perini was not a

competitor of Atlantic's. Transcript, Non-Jury Trial Proceedings

- Day 1, at 106. Therefore, we cannot assume knowledge of

Atlantic's trade practices. Furthermore, another Atlantic

witness testified that he discussed the terms of the contract

with a Perini representative, but never explained the alleged

trade usage of "all available." Id. at 70. Given the lack of

-5-

evidence, we cannot find that the district court clearly erred in

finding that the proposed trade usage of the term did not

supplement the contract terms.

II. Section 2-306

Both parties agree that the disputed contract

constitutes an output contract governed by 2-306 of the Code.

Section 2-306 of the Code provides in relevant part:

(1) A term which measures the quantity by
the output of the seller . . . means such
actual output . . . as may occur in good
faith, except that no quantity
unreasonably disproportionate to any
stated estimate . . . may be tendered or
demanded.

In the present case, the contract provided an estimate

of the expected output, and Perini tendered only 15% of that

quantity. Thus, Atlantic argues that according to 2-306,

Perini violated the contract.

While many courts and commentators have discussed the

meaning of the "unreasonably disproportionate" clause of 2-306

as applied to requirements contracts, little, if anything, has

been written on the clause's application to output contracts. We

review the former analysis, however, because it provides valuable

instruction due to the similarity between these two types of

contracts.

With respect to requirements contracts, courts differ

on the meaning of the "unreasonably disproportionate" clause.

Some courts find that "even where one party acts with complete

good faith, the section limits the other party's risk in

-6-

accordance with the reasonable expectations of the parties."

Orange Rockland v. Amerada Hess, 397 N.Y.S.2d 814, 819 (1977).

Most courts and commentators, however, treat cases in which the

buyer demands more than the stated estimate differently than

cases in which the buyer demands less. See, e.g., Empire Gas

Corp. v. American Bakeries Co., 840 F.2d 1333, 1337-38 (7th Cir.

1988); Angelica Uniform Group, Inc. v. Ponderosa Systems, Inc.,

636 F.2d 232, 232 (8th Cir. 1980) (per curiam); R.A. Weaver and

Associates, Inc. v. Asphalt Construction, Inc., 587 F.2d 1315,

1322 (D.C. Cir. 1978). The courts that employ separate analyses

hold that while 2-306 precludes buyers from demanding a

quantity of goods that is unreasonably disproportionate to a

stated estimate, it permits "good faith reductions that are

highly disproportionate." R.A. Weaver and Associates, Inc., 587

F.2d at 1315 (emphasis added).4

The Seventh Circuit explained the argument well, Empire

Gas Corp., 840 F.2d at 1338-40, and we adopt its reasoning.

Essentially, the argument is the following. The "unreasonably

disproportionate" clause is somewhat redundant in light of the

good faith requirement in that section. The clause therefore was

4 The comments to the Code shed little light on the issue as
they, too, are ambiguous. Empire Gas Corp. v. American Bakeries

Co., 840 F.2d at 1338. Comment 3 to 2-306, for example,

provides that an "agreed estimate is to be regarded as a center
around which the parties intend the variation to occur,"
suggesting that the two situations should be treated similarly.
Comment 2 to 2-306, on the other hand supports the view that
the two situations should receive different treatment as it
provides that "good faith variations from prior requirements are
permitted even when the variation may be such as to result in
discontinuance."

-7-

likely provided to explain the good faith term. The good faith

requirement with respect to disproportionately increased demands

needed explanation as certain forms of exploitation in that

situation do not clearly constitute bad faith. For example, if

the market price of the subject goods rises above the contract

price, a buyer in a requirements contract might be tempted to

demand more goods than it truly needs in order to resell them for

the better market price. The clause eliminates that opportunity.

On the other hand, exploitation, beyond bad faith, is not a

concern if a buyer demands less than a stated estimate. The

seller has the opportunity to sell any excess of the subject

goods on the market.

Moreover, an obligation to buy approximately a stated

estimate of goods would pose a significant burden on buyers as it

would force them to make inefficient business judgments, when the

point of entering a requirements contract was to engage suppliers

without binding themselves to buy more goods than they need.

Essentially, a requirements contract represents a risk

allocation. "The seller assumes the risk of a change in the

buyer's business that makes continuation . . . costly, but the

buyer assumes the risk of a less urgent change in []

circumstances." Id. at 1340.

The same rationale supports different treatment of

cases such as the present one, in which the seller in an output

contract tenders less than a stated estimate, from cases in which

the seller tenders more. If a seller saw an opportunity to

-8-

increase his profits by buying additional goods to resell as

output to the buyer, this exploitation might not conclusively

establish bad faith. The proviso would forbid such conduct. See

id. at 1338. On the other hand, an obligation to sell

approximately the stated estimate may force the seller to make

inefficient business decisions that the seller did not likely

intend when he bargained to keep the contract's quantity

provision open.

Like the risk allocation in the requirements contract,

the output contract allocates to the buyer the risk of a change

in the seller's business that makes continuation costly, while

the seller assumes the risk of a less urgent change in

circumstances. Indeed, pre-Code Massachusetts courts held that

output contracts necessarily contemplated that the level of

production would be governed by business judgment. See

Neofotistos v. Harvard Brewing Co., 171 N.E.2d 865, 868 (Mass.

1961). We see no reason for a change in that rationale.

Adopting this interpretation of 2-306, our next, and

only inquiry under this section, is whether Perini acted in good

faith.

III. Good faith

The district court determined that Perini acted in good

faith. This was a factual determination that we review only for

clear error. Athas, 904 F.2d at 80.

Atlantic offers two indications of bad faith by Perini.

First, Atlantic argues that Perini acted in bad faith by failing

-9-

to notify Atlantic of the June 21 test results. However,

Atlantic offered no evidence that the additional contaminated

ballast signified to Perini that the contract would end. Indeed,

the record indicates that the additional contamination was good

news to Perini because the more contamination that existed, the

more money Perini stood to earn under the contract. The MBTA did

not notify Perini of its desire to end the contract until August

18 when it suspended the undercutting; Atlantic learned of the

suspension just four days later. Thus, the court did not clearly

err in finding that Perini acted in good faith with respect to

notification.

Second, Atlantic argues that Perini acted in bad faith

by failing to make a reasonable attempt to complete the MBTA

project when the MBTA eliminated the undercutting. Atlantic

contends that in its negotiations for an equitable adjustment of

the contract, Perini requested an unreasonable increase in the

contract price. Thus, Atlantic argues that Perini's attempt to

complete the project was in bad faith.

Based on the evidence presented, however, this argument

fails. For one thing, a contractor may seek an equitable

adjustment to the contract when a large quantity of work is

eliminated. See Peter Kiewit Sons' Co. v. United States, 109 Ct.

Cl. 517, 522-23 (1947). Atlantic failed to show that Perini did

not make reasonable attempts to negotiate an adjustment. That

the MBTA and Perini failed to reach an acceptable agreement does

not show that the attempted negotiations were in bad faith.

-10-

Moreover, a party who ceases performance under an

output contract for independent business reasons acts in good

faith. Neofotistos, 171 N.E.2d at 868. Atlantic offered no

evidence that Perini did not agree to end the MBTA contract due

to a valid independent business reason. Indeed, Atlantic offered

no evidence of any reason why Perini agreed to end the contract.

Thus, the district court did not clearly err in its good faith

determination.

CONCLUSION

Based on the evidence presented, the district court

properly granted summary judgment in favor of Perini.

Affirmed.

-11-